# JANE DOE *v.* JOHN DOE
## (SC 15436)
## (SC 15437)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and Peters, Js.[1]

---

[1] This case was first argued before a panel of this court consisting of Justices Borden, Berdon, Norcott, Katz and Peters. Thereafter, the court decided to consider the case en banc and Chief Justice Callahan and Justice Palmer were added to the panel. In addition, the parties and amici curiae were ordered to submit supplemental briefs regarding certain issues. See footnote 15 of this opinion.

Argued March 20, 1997—officially released April 7, 1998

*Helen F. Ryan* and *Daniel B. Ryan,* for the appellant in Docket No. 15436, appellee in Docket No. 15437 (plaintiff).

*Daniel Z. Shapiro,* for the appellant in Docket No. 15436, appellee in Docket No. 15437 (minor child).

*Frank C. White, Jr.*, for the appellee in Docket No. 15436, appellant in Docket No. 15437 (defendant).

*Christine M. Whitehead, Louis I. Parley* and *William T. Fitzmaurice* filed a brief for the American Academy of Matrimonial Lawyers, Connecticut Chapter, as amicus curiae.

*Richard Blumenthal*, attorney general, and *Gregory T. D'Auria* and *Jane R. Rosenberg*, assistant attorneys general, filed a brief for the attorney general as amicus curiae.

*Opinion*

BORDEN, J. This dissolution of marriage case involves a custody dispute concerning a minor child who was conceived by artificial insemination between the defendant husband[2] and a surrogate mother (surrogate) whose parental rights and whose then husband's parental rights, if any, have now been terminated. Although the surrogate turned the child over to the plaintiff wife and the defendant upon the birth of the child, and although both parties raised the child, who is now age fourteen, as their daughter, no adoption proceedings were ever instituted by which the plaintiff would have become the adoptive mother of the child.

The trial court, *Stanley, J.*, ruled that it had no subject matter jurisdiction to adjudicate the custody of the minor child incident to the dissolution proceeding because she was not a " 'child of the marriage' " within the meaning of our dissolution statutes. The principal issues on appeal involve whether the trial court had subject matter jurisdiction, pursuant to General Statutes § 46b-56, to adjudicate the child's custody, and whether the plaintiff legally may be considered to be a parent of the child for purposes of that adjudication.

---

[2] On September 18, 1996, this court granted the plaintiff's request to protect the identity of the parties by granting this case anonymous status.

The plaintiff and the minor child, acting through her attorney appointed by the trial court, jointly appeal from the judgment of dissolution challenging the trial court's determination that it had no jurisdiction to adjudicate the custody of the child. The defendant also appeals from the judgment challenging the trial court's determination regarding the causes of the marital breakdown, and its awards regarding allocation of the assets of the parties, alimony and attorney's fees.[3] We conclude that: (1) the child is not a child of the marriage within the meaning of our marital dissolution statutes; (2) nonetheless, the trial court had subject matter jurisdiction, pursuant to § 46b-56,[4] to adjudicate the custody of the

---

[3] The parties appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeals to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

[4] General Statutes § 46b-56 provides: "Superior Court orders re custody and care of minor children in actions for dissolution of marriage, legal separation and annulment. Access to records of minor children by noncustodial parent. Parenting education program. (a) In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may at any time make or modify any proper order regarding the education and support of the children and of care, custody and visitation if it has jurisdiction under the provisions of chapter 815o. Subject to the provisions of section 46b-56a, the court may assign the custody of any child to the parents jointly, to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. The court may also make any order granting the right of visitation of any child to a third party, including but not limited to, grandparents.

"(b) In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into consideration the causes for dissolution of the marriage or legal separation if such causes are relevant in a determination of the best interests of the child and (2) consider whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b.

"(c) In determining whether a child is in need of support and, if in need, the respective abilities of the parents to provide support, the court shall take into consideration all the factors enumerated in section 46b-84.

child as between the defendant, as the child's father, and the plaintiff, as a third person asserting a claim to custody of the child; and (3) for purposes of that adjudication, under the undisputed facts of this case the statutory presumption afforded by General Statutes § 46b-56b[5] has been rebutted as a matter of law. We also conclude that the trial court's determination regarding the causes of the marital breakdown is supported by the evidence. Accordingly, we reverse the judgment in part and remand the case for a trial on the issue of custody and on the necessarily related financial issues.

The plaintiff brought this dissolution action in January, 1991. In her original complaint, she alleged that she and the defendant had one minor child "issue of their marriage," who was born on April 30, 1983. On February 11, 1991, the plaintiff and the defendant entered into a signed stipulation for temporary orders, without prejudice to the right of either party "to reclaim

---

"(d) When the court is not sitting, any judge of the court may make any order in the cause which the court might make under subsection (a) of this section, including orders of injunction, prior to any action in the cause by the court.

"(e) A parent not granted custody of a minor child shall not be denied the right of access to the academic, medical, hospital or other health records of such minor child unless otherwise ordered by the court for good cause shown."

We note that § 46b-56 (a) provides in relevant part that the court must have "jurisdiction under the provisions of chapter 815o. . . ." Chapter 815o of the General Statutes is the Uniform Child Custody Jurisdiction Act (UCCJA). General Statutes § 46b-93 (a) (1) (A) gives jurisdiction over the custody determination regarding the child to the court of the home state of the child at the time of the commencement of the proceedings, which, of course, is Connecticut. The UCCJA has no other application to this case.

[5] General Statutes § 46b-56b provides: "Presumption re best interest of child to be in custody of parent. In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody."

all matters to the court so that the court at a later date could have a full hearing" on any of the matters covered by the stipulation. The stipulation provided for joint custody[6] of the child "but with the principal place of residence" of the child with the plaintiff, and also provided that the child would reside with the defendant on certain weekends.[7] This stipulation was approved by the court on the same date.[8]

In June, 1993, however, the plaintiff amended her complaint by deleting the allegation that the child was the child of the marriage, and alleged instead that "[t]he plaintiff and the defendant have been acting as the parents of [the child] since the child's birth. The plaintiff is neither the biological mother, nor has she legally adopted the minor child. The plaintiff has no knowledge whether the defendant is the natural father of said child or not, and the defendant has not yet legally adopted said child to the best of her knowledge." The plaintiff included in her claims for relief orders for sole or joint custody of the child, visitation rights and support. The defendant, in his answer filed in December, 1994, left the plaintiff to her proof regarding her allegation that

---

[6] The stipulation also provided for the plaintiff to maintain possession of the parties' house, for medical coverage for the plaintiff and the child, for use of a car by the plaintiff, and for unallocated alimony and support to be paid by the defendant to the plaintiff.

[7] Testimony at the trial, held from January through June, 1995, established that, since the date of the stipulation, the parties have been operating thereunder, except that, although the original stipulation provided for the child to reside with the defendant on alternate weekends, the defendant's weekends with the child have been expanded to three out of every four monthly weekends, and that at certain times the child spent two weeks summer vacation with the defendant.

[8] Although the parties have not provided us with a transcript of the proceedings of February 11, 1991, the original stipulation in the trial court file contains what appears to be the signature of *Arena, J.*, dated February 11, 1991. In addition, on May 24, 1993, at a hearing on a motion, the trial court, *Spallone, J.*, ordered that the status quo remain "as to the agreement between [the] parties," and this was reaffirmed by the trial court, *R. O'Connell, J.*, at a hearing on October 13, 1993.

she had been acting as the child's parent, denied that the plaintiff did not know whether the defendant was the child's natural father, and admitted the rest of the allegations, namely, that the defendant had been acting as the child's parent, that the plaintiff was neither the biological nor the adoptive mother of the child, and that the defendant had not legally adopted the child. In addition, the defendant, by way of special defenses, claimed that the child was not a child of the marriage and that, therefore, the court lacked jurisdiction "to determine any issues with respect to her in the context of this action."[9]

In December, 1993, the defendant filed a petition in the Middletown Probate Court for termination of the parental rights of the surrogate and her now former husband, who was married to her at the time of the child's birth. The defendant also filed a petition in the Probate Court for a determination that he is the father of the child. The Probate Court had not acted on either of these petitions when the trial of this case began in January, 1995. On June 28, 1995, however, the Probate Court granted the defendant's paternity petition and adjudicated him to be the father of the child. On September 6, 1995, the Probate Court granted the petition for termination of the parental rights of the surrogate and her former husband on the ground of abandonment.[10]

[9] The defendant also filed a counterclaim for dissolution of the marriage, in which he alleged that "[o]ne minor child . . . has been born since the date of the marriage, which child is not the lawful issue of the marriage. The defendant is the biological father of the minor child. The plaintiff is not the biological mother of the minor child." In his claim for relief on the counterclaim, the defendant sought "[s]ole custody of the minor child . . . ."

The defendant also claimed that the marriage should be annulled, on the bases that: (1) the plaintiff's prior divorce had been invalidly obtained; and (2) the plaintiff had fraudulently misrepresented to the defendant that she had been divorced prior to their marriage. The trial court rejected these claims, and the defendant has not renewed them on appeal.

[10] In both orders, the Probate Court provided that "[n]othing herein shall expand or diminish the existing Superior Court orders concerning custody,"

These orders have not been appealed, and they are, therefore, final.

Meanwhile, however, the trial of this case had been proceeding. After seventeen days of testimony, beginning on January 4, 1995, and ending on June 9, 1995, the trial court, in a memorandum of decision issued on November 15, 1995, found the following: the parties' marriage has broken down irretrievably; there is no prospect of reconciliation; and, therefore, the marriage should be dissolved. The court found further that the plaintiff, who had been born in India while that nation was under British rule, had been married in England to another British subject and had three children from that marriage, all of whom are now more than eighteen years of age. In 1967, the plaintiff came to this country and worked as a companion and housekeeper for the defendant's mother. In 1971, the parties began a relationship, and in April, 1982, the plaintiff obtained a divorce in Florida from her first husband. Both parties desired to have children, although the defendant was determined to have a child with or without the plaintiff's cooperation. The plaintiff, however, had undergone a tubal ligation, and an attempt to reverse it was unsuccessful. The plaintiff also suffered from permanent injuries as a result of an automobile accident in 1972.

The trial court also found that the defendant, through an advertisement in a Connecticut newspaper, sought a surrogate mother to carry and deliver a baby. The court found further that the surrogate responded, that financial arrangements were made, and that, at the surrogate's home in Connecticut with both the defendant and the plaintiff present, the surrogate was "impregnated with the defendant's sperm by use of a syringe

---

and that the defendant "reserves all claims as to jurisdiction of the Superior Court as to any issues relating to said minor child."

. . . ."[11] The court also found that "[t]he surrogate mother became pregnant"; see footnote 11 of this opinion; and that, throughout the prenatal period the defendant accompanied her to doctors' appointments, where she used the plaintiff's name, social security number and other statistical data regarding the plaintiff. Also, on occasion the plaintiff would accompany the defendant and the surrogate to the doctors' appointments, and on occasion would stuff a pillow in her clothing to simulate the appearance of being pregnant.

The plaintiff and the defendant were married on January 7, 1983, while the surrogate was approximately four months pregnant with the child. At the time of the child's birth on April 30, 1983, the surrogate was admitted to the hospital under the plaintiff's name, social security number and other relevant data. The trial court also found that the defendant supplied the hospital with the pertinent data for the child's birth certificate "under the ongoing ruse that the birth mother was [the plaintiff]." The court found further that, upon discharge from the hospital, the surrogate turned the child over to the plaintiff and the defendant, "who nurtured and raised the child with no further participation by the surrogate mother."

The trial court noted that "[o]f significance is the fact that the surrogate mother was married at the time of the child's birth, although she has since had that marriage dissolved." Noting further the presumption that a child

---

[11] Despite its finding that "the surrogate mother was impregnated with the defendant's sperm," however, the trial court also noted "that this court is not making a finding with respect to the paternity of the minor child . . . ." In light of these two apparently contradictory findings, we interpret the trial court's use of the term "impregnated" as a misnomer; we believe that the trial court meant that, as the surrogate testified at trial, the defendant's sperm was inserted into her vagina by the use of a syringe. This interpretation, moreover, is consistent with the trial court's later conclusion that the presumption that a child born to a married woman is her husband's child had not been rebutted by clear and convincing proof.

born during wedlock is the child of the husband, unless the presumption is rebutted by clear and convincing proof; *Schaffer* v. *Schaffer*, 187 Conn. 224, 226, 445 A.2d 589 (1982); the court determined that the presumption had not been rebutted by that standard of proof. In this connection, the court noted further that it was undisputed that the child was not the child of the plaintiff and was not, therefore, the "issue of the marriage." The court also noted that there had been no evidence presented during trial that the parental rights of the surrogate or her then husband had been terminated, that blood testing of the defendant and the surrogate showed merely that the defendant could not be excluded as the father of the child but did not conclusively establish his paternity, and that there had been no evidence during trial that any probate court of competent jurisdiction had found that the defendant was the father of the child.

After the conclusion of the trial but before the trial court had issued its decision, the defendant filed two motions to open the evidence to include the two Probate Court judgments regarding the termination of the parental rights of the surrogate and her former husband, and the adjudication of the defendant's parentage of the child. The trial court, however, denied these two motions, and made "its findings based upon the evidence presented during the seventeen days of trial."[12]

[12] The trial court reasoned that the defendant had not shown that he had failed to offer this evidence during the trial due to inadvertence or mistake, especially considering that "the court twice during the long life of this dissolution action [had] advised the defendant that the court's jurisdiction to determine the custody of the minor child was contingent upon the defendant obtaining judgment from the Probate Court terminating any parental rights in the minor child claimed or maintained by the surrogate mother and her husband." The court also reasoned that no miscarriage of justice would ensue by its failure to admit this late-offered evidence because the parties could nonetheless resort to a petition for a writ of habeas corpus to determine the custody of the child.

On the basis of those factual findings, the trial court concluded that it did not have subject matter jurisdiction to enter orders regarding the custody or support of the minor child because she was neither a child "born issue of the marriage," nor a child adopted by both parties or a natural child of one of the parties who had been adopted by the other. See General Statutes § 46b-58.[13] Although its ruling left "a substantial number of issues unresolved regarding" the child, the court determined that "the best interests of the child are not legally sufficient" to overcome what it perceived as the "jurisdictional impasse which has been created by the actions and inactions of the two people she has always considered her parents." The court also rejected the request of the child's attorney to consider the psychological and family relations reports that had been introduced into evidence because, in the court's view, "absent the court's jurisdiction over [the child], such data is irrelevant in the context of the present action."

The trial court, therefore, turned to the merits of the dissolution action, irrespective of any claims regarding the custody of the child and her support. The court found that the parties shared equally in the causes of the breakdown of the marriage. In this connection, the court found that the plaintiff had difficulty controlling her anger, particularly after consuming alcohol, and that the defendant had engaged in physical violence toward the plaintiff. The court found further that communication between them had been strained, "although they appear capable of accommodating each other

---

[13] General Statutes § 46b-58 provides: "Custody, maintenance and education of adopted children. The authority of the Superior Court to make and enforce orders and decrees as to the custody, maintenance and education of minor children in any controversy before the court between husband and wife brought under the provisions of this chapter is extended to children adopted by both parties and to any natural child of one of the parties who has been adopted by the other."

when it comes to decisions regarding [the child's] religious education and nurturing in general." It also found, however, that their "inability or unwillingness to subordinate their own hostilities in an effort to properly finalize [the child's] legal status vis-a-vis each of them underscores the breakdown of the marriage." In addition, the court found that the defendant, through inheritance and sound investment practices, had acquired substantial assets, and that the plaintiff had maintained a reasonably stable and fit home environment. The court also found that the plaintiff had limited employment skills that were diminished further as a result of her age and health problems. Accordingly, the trial court rendered a decree dissolving the marriage,[14] from which these appeals followed.

In his initial brief on his appeal from the judgment of the trial court, the defendant challenged: (1) the court's finding that the parties contributed equally to the breakdown of the marriage; (2) the court's award of periodic alimony and the related life insurance order; and (3) the court's order requiring him to pay both the plaintiff's and the child's attorney's fees. In their initial brief on their joint appeal, the plaintiff and the child's

---

[14] The trial court also entered the following financial orders. The defendant was to convey his interest in the parties' jointly owned home to the plaintiff, who was to hold him harmless from any encumbrances thereon, and the defendant was to transfer to the plaintiff certain items of personal property. In addition, the defendant was ordered to pay the plaintiff $150,000 lump sum alimony, $700 per week periodic alimony until the earliest of the plaintiff's death, remarriage or reaching the age of sixty-five, and to maintain a declining balance life insurance policy on his life, with the plaintiff named as irrevocable beneficiary, for as long as periodic alimony was payable to the plaintiff. The court also ordered the defendant to transfer to the plaintiff one half of his Keough and individual retirement accounts by way of a qualified domestic relations order. The defendant was also ordered to maintain medical insurance for the plaintiff until she became eligible for medicare, and to continue to pay, until December, 1996, the lease payments on the automobile used by the plaintiff. Finally, the court ordered the defendant to pay the plaintiff's attorney's fees and disbursements in the amount of $85,375.60, and to pay the child's attorney's fees in the amount of $25,000.

attorney claimed that the trial court had improperly: (1) failed to find that the defendant was estopped from denying that the child was the issue of the marriage; (2) failed to assert jurisdiction over the custody of the child, thus depriving her of her right to equal protection of the law; and (3) failed to consider the best interest of the child in determining that it did not have jurisdiction to determine the custody of the child. Following oral argument in these appeals, we decided, sua sponte, to consider the case en banc; see footnote 1 of this opinion; and to request supplemental briefs by the parties and by the two amici curiae, the American Academy of Matrimonial Lawyers, Connecticut Chapter (academy), and the attorney general of Connecticut, on certain issues.[15]

In his supplemental brief, the defendant claimed that: (1) the plaintiff is not and cannot be considered a parent of the child; (2) even if the court were to adopt an "equitable parent" doctrine, the plaintiff would not qualify for that doctrine under the facts of this case; and

---

[15] The order for supplemental briefs provided: "Assume the facts as found by the trial court, supplemented, however, by the facts disclosed by the Probate Court decree, namely, that the defendant . . . is the biological father of the minor child, and that the parental rights of the surrogate mother have been terminated.

"Under these circumstances, should the minor child be considered to be a 'child of the marriage' of the plaintiff . . . and defendant . . . and the plaintiff a 'parent' of the minor child, within the meaning of General Statutes § 46b-56?

"In addressing this question, consider the effect, if any, of: (1) *LaBella* v. *LaBella*, 134 Conn. 312, 57 A.2d 627 (1948), *Morrow* v. *Morrow*, 165 Conn. 665, 345 A.2d 561 (1974), and *Remkiewicz* v. *Remkiewicz*, 180 Conn. 114, 429 A.2d 833 (1980); (2) General Statutes § 46b-58; (3) General Statutes §§ 45a-771 through 45a-779 [chapter 803a, 'Children Conceived Through Artificial Insemination']; and (4) the doctrine of the equitable parent, as set forth in *Atkinson* v. *Atkinson*, 160 Mich. App. 601, 408 N.W.2d 516 (1987), or a similar doctrine."

We express our appreciation to the amici curiae for accepting our invitation to participate in this appeal, and for the highly professional quality of their briefs.

(3) under the law of the state, the child is not a "child of the marriage" of the parties. In their supplemental brief, the plaintiff and the child's attorney claimed that: (1) the child is the issue of the parties' marriage because her birth certificate establishes her legitimacy and her status as the parties' child, and because of the legislative intent and policy behind the statutes governing artificial insemination; General Statutes §§ 45a-771 through 45a-779;[16] and (2) the court should recognize the doctrine

[16] General Statutes § 45a-771 provides: "(a) It is declared that the public policy of this state has been an adherence to the doctrine that every child born to a married woman during wedlock is legitimate.

"(b) Sections 45a-771 to 45a-779, inclusive, shall be construed as a codification and clarification of such doctrine with respect to any child conceived as a result of heterologous artificial insemination."

General Statutes § 45a-772 provides: "A.I.D. Who may perform. Consent required. (a) The technique known as heterologous artificial insemination, or artificial insemination with the semen of a donor, referred to in sections 45a-771 to 45a-779, inclusive, as A.I.D., may be performed in this state only by persons certified to practice medicine in this state pursuant to chapter 370.

"(b) A.I.D. shall not be performed unless the physician receives in writing the request and consent of the husband and wife desiring the utilization of A.I.D. for the purpose of conceiving a child or children."

General Statutes § 45a-773 provides: "Request and consent to be filed in Probate Court. Confidentiality. (a) Whenever a child is born who was conceived by the use of A.I.D., a copy of the request and consent required under subsection (b) of section 45a-772, together with a statement of the physician who performed the A.I.D., that to the best of his knowledge the child was conceived by the use of A.I.D., shall be filed with the judge of probate in the district in which the child was born or in which the child resides.

"(b) The information contained in such statement may be disclosed only to the persons executing the consent. No other person shall have access to the information except upon order of the Probate Court for cause shown."

General Statutes § 45a-774 provides: "Status of child born as result of A.I.D. Any child or children born as a result of A.I.D. shall be deemed to acquire, in all respects, the status of a naturally conceived legitimate child of the husband and wife who consented to and requested the use of A.I.D."

General Statutes § 45a-775 provides: "No rights in donor of sperm. A donor of sperm used in A.I.D., or any person claiming by or through him, shall not have any right or interest in any child born as a result of A.I.D."

General Statutes § 45a-776 provides: "Status of child determined by jurisdiction of birth. (a) Any child conceived as a result of A.I.D. performed in Connecticut and born in another jurisdiction shall have his status determined by the law of the other jurisdiction unless the mother of the child is domiciled in Connecticut at the time of the birth of the child.

of the "equitable parent," and under that doctrine, the court had jurisdiction over the custody of the child.[17]

## I

It is useful to note first what this case does not involve. It does not involve questions of how, if at all,

"(b) If a child is conceived by A.I.D. in another jurisdiction but is born in Connecticut to a husband and wife who, at the time of conception, were not domiciliaries of Connecticut, but are domiciliaries at the time of the birth of the child, the child shall have the same status as is provided in section 45a-774, even if the provisions of subsection (b) of section 45a-772 and section 45a-773 may not have been complied with."

General Statutes § 45a-777 provides: "Inheritance by child conceived as a result of A.I.D. (a) A child born as a result of A.I.D. may inherit the estate of his mother and her consenting spouse or their relatives as though he were the natural child of the mother and consenting spouse and he shall not inherit the estate from his natural father or his relatives.

"(b) The mother and her consenting husband or their relatives may inherit the estate of a child born as a result of A.I.D., if the child dies intestate, and the natural father or his relatives shall not inherit from him."

General Statutes § 45a-778 provides: "Words of inheritance to apply to child conceived through A.I.D. (a) The words 'child', 'children', 'issue', 'descendant', 'descendants', 'heir', 'heirs', 'unlawful heirs', 'grandchild' and 'grandchildren', when used in any will or trust instrument, shall, unless the document clearly indicates a contrary intention, include children born as a result of A.I.D.

"(b) The provisions of this section shall apply to wills and trust instruments whether or not executed before, on or after October 1, 1975, unless the instrument indicates an intent to the contrary."

General Statutes § 45a-779 provides: "Status of child conceived through A.I.D., born prior to October 1, 1975. Nothing in sections 45a-771 to 45a-779, inclusive, shall be construed as a change or modification of the rights or status of children born before October 1, 1975, but shall be construed as a clarification and codification of the rights and status which the children had on said date."

[17] The positions of the amici both track and depart from the positions of the parties and the minor child. The academy claims that: (1) the defendant should be estopped from denying that the child is issue of the marriage; (2) the plaintiff is a parent of the child under the doctrines of "equitable parent" or loco parentis; and (3) if the plaintiff is considered either as the parent of the child or as an interested third party to the issue of the child's custody, the court had subject matter jurisdiction over the custody of the child under our statutes.

The attorney general urges us not to adopt a new common-law doctrine of an equitable parent, and to base our decision upon a construction of our

to reconcile our family relations statutes, as interpreted by this court, with scientifically new methods of conception that were not available when those statutes were enacted or when those interpretations were issued. Thus, we need not, and do not, in this case confront questions of parentage, under those statutes, resulting from such recent scientific innovations as, for example, in vitro fertilization using donated eggs that are then implanted in a woman's womb; see, e.g., Office of Technology Assessment, Infertility: Medical and Social Choices (1988) p. 255; implantation into a woman's womb of a frozen embryo formed by the sperm and egg of strangers to both the woman and her husband; see, e.g., G. Kolata, "Clinics Selling Embryos Made For 'Adoption,'" N.Y. Times, November 23, 1997, p. 1; or other similar innovations in which a woman who gives birth to a child is not the same woman who produced the egg that was ultimately fertilized by a man's sperm. See, e.g., 2 Royal Commission on New Reproductive Technologies, Proceed With Care: Final Report of the Royal Commission on New Reproductive Technologies (1993) pp. 662–63 (describing various "gestational" surrogacy arrangements).[18] Furthermore, although the facts of this case are certainly unusual, neither the social arrangement by which the child was conceived and

statutes. He claims that various legislative amendments to our dissolution statutes in 1963, and thereafter, have eliminated the concept of a "child of the marriage" from the statutes regarding the award of custody in a dissolution proceeding, and that "it is reasonable in the context of this dissolution to construe the term 'parent' in . . . § 46b-56 to include the plaintiff . . . ." The attorney general also argues, in agreement with the defendant, that our statutes regarding artificial insemination have no application to this case.

[18] Thus, the case recently decided by the California Court of Appeal; *Buzzanca* v. *Buzzanca*, California Court of Appeal, Docket No. G022147 (4th D. March 10, 1998); on which the concurring and dissenting opinion relies, falls within that class of cases that the present case does not involve. When and if a case arises, like *Buzzanca*, but unlike this case, that does present the question of the meaning of our dissolution statutes as applied to scientifically new methods of conception that were not available when these statutes were enacted and interpreted, we will decide that question.

delivered, surrogate motherhood, nor the method of conception, artificial insemination, is new.

Although it has become widespread only in recent decades; H. Ragone, Surrogate Motherhood: Conception in the Heart (1994) p. 194 n.2; surrogate motherhood is a practice with ancient roots. Throughout history couples unable to have children because of the woman's inability to conceive or carry a child to term have arranged for impregnation of another woman with the husband's sperm in order to produce a child for the couple to raise as their own. S. Phillips, "Reproductive Ethics," 4 CQ Researcher 291, 301 (1994). The Bible's Book of Genesis, for instance, records three instances of the practice. Genesis 16 (recounting surrogacy arrangement among Abram, Sarai and Hagar); Genesis 30:1–24 (recounting surrogacy arrangements among Jacob, Rachel and Bilhah, and among Jacob, Leah and Zilpah). Of course, as in the present case, surrogate motherhood today generally involves implantation of the sperm through artificial insemination instead of intercourse. This practice, however, is also neither new nor scientifically advanced.

Artificial insemination involving humans dates back at least to the late 1770s, when the first authoritatively reported use of the technique took place under the direction of an English physician, Sir John Hunter. F. Poynter, "Hunter, Spallanzani, and the History of Artificial Insemination," in Medicine, Science and Culture (L. Stevenson & R. Multhauf, eds., 1968) pp. 97, 100. By the 1890s, artificial insemination had become an established medical specialty in numerous European cities; id., pp. 101–109; and by the 1940s, it had developed into an established treatment for fertility problems in the United States. Note, "The Socio-Legal Problems of Artificial Insemination," 28 Ind. L.J. 620, 620–22 (1953). Essentially, the technique is simple, merely involving substitution of an instrument such as a syringe for the

traditional means of depositing semen into the woman's vagina. D. Wikler & N. Wikler, "Turkey-baster Babies: The Demedicalization of Artificial Insemination," 69 Milbank Q. 5, 8 (1991). It can be performed without the assistance of trained medical professionals, as it was in the present case.

We do not mean to imply that we are insensitive to the interests of the child in this case, in particular, or to the plight of couples who, faced with difficulties in conceiving a child, are required to resort to such recent scientific innovations, in general. Moreover, we do not seek to minimize the difficulties of the legal questions that *are* presented by this case. Our point here is solely that this case does not present questions involving the meaning of our statutes in the factual context of a scientifically new method of conception.[19]

## II

We next consider the trial court's denial of the defendant's motion to open the evidence so as to admit the two probate decrees, which conclusively established that the defendant is the father of the child, and that the parental rights of the surrogate and her former husband had been terminated. We conclude that the

[19] In addition, we are not required in this case to decide whether, or to what extent, a surrogacy contract, by which the surrogate obligates herself to surrender the child to the child's father and his spouse, is enforceable. In this case, the surrogate did surrender the child, and the parental rights of the surrogate and her husband have been terminated.

Finally, we do not decide in this case that the lack of legal parental status in the plaintiff deprives her of any rights of access to the academic or health records of the child under § 46b-56 (e), which provides: "A parent not granted custody of a minor child shall not be denied the right of access to the academic, medical, hospital or other health records of such minor child unless otherwise ordered by the court for good cause shown." The obvious purpose of that statute is to provide that, unless a court orders otherwise, a noncustodial parent may not be deprived of access to such records by virtue of his or her noncustodial status. It does not, however, mean that a third party who is granted custody of a child may not be entitled to such access.

court abused its discretion in denying the defendant's motion.

"Whether or not a trial court will permit further evidence to be offered after the close of testimony in the case is a matter resting within its discretion. *State* v. *Levy*, 103 Conn. 138, 145, 130 Atl. 96 [1925]; *State* v. *Chapman*, 103 Conn. 453, 479, 130 Atl. 899 [1925]; *King* v. *Spencer*, 115 Conn. 201, 203, 161 Atl. 103 [1932]; *State* v. *Swift*, 125 Conn. 399, 405, 6 Atl. (2d) 359 [1939]. *Hauser* v. *Fairfield*, 126 Conn. 240, 242, 10 A.2d 689 [1940]. In the ordinary situation where a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence upon a material issue in the case of such a nature that in its absence there is serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time before the case has been decided." (Internal quotation marks omitted.) *State* v. *Holmquist*, 173 Conn. 140, 152, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977).

Deciding this contested marital dissolution case without cognizance of the undisputed facts regarding the paternity of the child and the termination of the potentially competing parental rights, presented a serious danger of a miscarriage of justice. First, those facts undermined the court's conclusion that it had no jurisdiction to consider the custody of the child, because they converted the case from one in which the presumed parents of the child were not before the court, to a case in which at least one conclusively established parent—the defendant—was before the court. Second, relegating the parties to a subsequent habeas corpus action, which the trial court contemplated, would have been unsatisfactory because, even after the close of evidence but before the court decided the case, it should have been apparent that a determination in a subsequent habeas proceeding regarding the custody of the

child would have also required a determination regarding her financial support, either in the habeas proceeding or upon a return to the dissolution action. That determination, in turn, would have necessitated the reworking of the financial orders that the trial court entered in this action regarding the other but inextricably linked financial issues. See *Sunbury* v. *Sunbury*, 210 Conn. 170, 175, 553 A.2d 612 (1989) (financial orders in dissolution action involve mosaic of inextricably intertwined issues). We therefore decide this case on the true state of the facts, namely, that the defendant is the biological father of the child, and that the parental rights of the surrogate and her husband have been terminated.

## III

We turn next to the following issues, which are raised by the parties, the child and the amici: (1) the viability of the concept of a "child of the marriage" under our dissolution of marriage statute; General Statutes § 46b-56; see footnote 4 of this opinion; and (2) whether that concept deprived the trial court of jurisdiction to adjudicate the custody of the child under the facts of this case. We conclude that, although the phrase "child of the marriage" is no longer contained in § 46b-56, the concept that it embodies, as authoritatively interpreted by decisions of this court, remains implicit in our entire statutory scheme governing marital dissolutions and retains viability by continuing to define who is a parent for purposes of awarding custody in a dissolution action. We also conclude, however, that the *jurisdictional* limitations that the concept previously had imposed on the trial court operating under that statute have been overtaken by subsequent statutory changes. On the basis of these conclusions, we determine that the trial court had jurisdiction to award custody of the child in this case, as between the defendant, as the father of the child, and the plaintiff, as an interested

third party with a powerful, albeit nonparental, claim to custody.

We preface this inquiry by reaffirming the established proposition that, although the court has broad equitable remedial powers in the area of marital dissolutions; *Pasquariello* v. *Pasquariello*, 168 Conn. 579, 585, 362 A.2d 835 (1975) ("[t]he power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage"); our marital dissolution law is essentially a creature of, and governed by, statute. "The Superior Court's power to grant divorces and thereby dissolve marriages comes from statutory authority, and from such jurisdiction over divorce derives the court's jurisdiction to make and enforce orders for care, custody and education of children. *White* v. *White*, 138 Conn. 1, 9, 81 A.2d 450 (1951); *LaBella* v. *LaBella*, 134 Conn. 312, 316, 57 A.2d 627 (1948) . . . ." (Citation omitted.) *Kennedy* v. *Kennedy*, 177 Conn. 47, 49–50, 411 A.2d 25 (1979). Furthermore, "Superior Court orders regarding custody of a minor child in an action for dissolution of a marriage are governed by General Statutes § 46b-56 . . . ." *Hall* v. *Hall*, 186 Conn. 118, 121, 439 A.2d 447 (1982). Thus, our task in the present case is not to determine what the equities of the case may say about whether the plaintiff should be considered as a parent of the child, or whether it would be in the child's best interest for the plaintiff to be so considered. To do so would be inconsistent with our established jurisprudence identifying our statutes as the source of the court's power to award custody of children in dissolution cases and interpreting the meaning of parenthood under those statutes. Our task, instead, is to determine, as a matter of statutory interpretation, the relationship between the plaintiff and the child for purposes of the court's power to award custody under § 46b-56.

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 755–56, 601 A.2d 1005 (1992)." (Internal quotation marks omitted.) *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 431–32, 692 A.2d 742 (1997).

We begin with the language of § 46b-56.[20] It deals with two separate but related situations. The first, and broader, situation is invoked by the first clause of the first sentence of § 46b-56 (a), which provides in relevant part: "In any controversy before the Superior Court as to the custody or care of minor children . . . ." That first clause, unlike the clause that follows it, is not addressed necessarily to the court's dissolution jurisdiction. It grants the court power in "any controversy," not limited to a dissolution action, to determine the custody or care of minor children. The first clause,

---

[20] It is true, as the attorney general correctly points out, that § 46b-56 no longer contains the phrase "child of the marriage," or a similar phrase, as did earlier versions of the statute. The absence of that particular phrase from § 46b-56 does not mean, however, as the attorney general also argues, that we are therefore free to determine that the plaintiff is the parent of the child, without reference to the meaning of the statutory language that remains. We must still determine whether the plaintiff is the parent of the child within the meaning of § 46b-56.

therefore, grants the court power to determine custody in, for example, a habeas corpus case involving custody of a minor child. The second clause of the first sentence of § 46b-56 (a), however, is more narrow and specific and provides in relevant part: "and at any time after the return day of any complaint under section 46b-45 . . . ." General Statutes § 46b-45 governs the filing of complaints for marital dissolution, annulment or legal separation.[21] Thus, the second clause of the first sentence of § 46b-56 (a) grants the court power to determine custody in a dissolution case.

In either situation, however, the language of the section differentiates between parents of a child and third parties. The second sentence of subsection (a) of § 46b-56 provides that "[s]ubject to the provisions of section 46b-56a,[22] the court may assign the custody of any child

[21] General Statutes § 46b-45 provides: "Service and filing of complaint. (a) A proceeding for annulment, dissolution of marriage or legal separation shall be commenced by the service and filing of a complaint as in all other civil actions in the Superior Court for the judicial district in which one of the parties resides. The complaint may also be made by the Attorney General in a proceeding for annulment of a void marriage. The complaint shall be served on the other party.

"(b) If any party is an inmate of a mental institution in this state, a copy of the complaint shall be served on the Commissioner of Administrative Services personally or by registered or certified mail. If any party is confined in an institution in any other state, a copy shall be so served on the superintendent of the institution in which the party is confined."

[22] General Statutes § 46b-56a provides: "Joint custody. Definition. Presumption. Conciliation. (a) For the purposes of this section, 'joint custody' means an order awarding legal custody of the minor child to both parents, providing for joint decision-making by the parents and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents. The court may award joint legal custody without awarding joint physical custody where the parents have agreed to merely joint legal custody.

"(b) There shall be a presumption, affecting the burden of proof, that joint custody is in the best interests of a minor child where the parents have agreed to an award of joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child or children of the marriage. If the court declines to enter an order awarding joint custody pursuant to this subsection, the court shall state in its decision the reasons for denial of an award of joint custody.

to the parents jointly, to either parent or to a third party." Subsection (a) of § 46b-56 further provides that "[t]he court may also make any order granting the right of visitation of any child to a third party, including but not limited to, grandparents." Furthermore, subsection (c) of § 46b-56 requires the court, in making a support award for "a child," to consider "the respective abilities of the parents to provide support," and to "take into consideration all the factors enumerated in section 46b-84." General Statutes § 46b-84, which is the statutory provision specifically governing the award of support for a minor child in a dissolution, annulment or legal separation case, uses the term "child" and the phrase "child of the marriage" interchangeably.[23] The language of § 46b-56, therefore, by itself and by its specific connection with § 46b-84, strongly suggests that in the marital dissolution context a "child" means a child of the marriage.

"(c) If only one parent seeks an order of joint custody upon a motion duly made, the court may order both parties to submit to conciliation at their own expense with the costs of such conciliation to be borne by the parties as the court directs according to each party's ability to pay."

[23] General Statutes § 46b-84 provides: "Parents' obligation for maintenance of minor *child*. Order for health insurance coverage. (a) Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the parents of a minor *child of the marriage*, shall maintain the *child* according to their respective abilities, if the *child* is in need of maintenance.

"(b) If there is an unmarried *child of the marriage* who has attained the age of eighteen, is a full-time high school student and resides with a parent, the parents shall maintain the *child* according to their respective abilities if the *child* is in need of maintenance until such time as such *child* completes the twelfth grade or attains the age of nineteen, whichever first occurs. The provisions of this subsection shall apply only in cases where the decree of dissolution of marriage, legal separation or annulment is entered on or after July 1, 1994.

"(c) In determining whether a *child* is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the *child*.

This suggestion is buttressed by reference to other, closely related statutes in this area of the law. General

"(d) At any time at which orders are entered in a proceeding for dissolution of marriage, annulment, legal separation, custody, or support, whether before, at the time of, or after entry of a decree or judgment, if health insurance coverage for a *child* is ordered by the court to be maintained, the court shall provide in the order that (1) the signature of the custodial parent or custodian of the insured dependent shall constitute a valid authorization to the insurer for purposes of processing an insurance reimbursement payment to the provider of the medical services, to the custodial parent or to the custodian, (2) neither parent shall prevent or interfere with the timely processing of any insurance reimbursement claim and (3) if the parent receiving an insurance reimbursement payment is not the parent or custodian who is paying the bill for the services of the medical provider, the parent receiving such insurance reimbursement payment shall promptly pay to the parent or custodian paying such bill any insurance reimbursement for such services. For purposes of subdivision (1), the custodial parent or custodian is responsible for providing the insurer with a certified copy of the order of dissolution or other order requiring maintenance of insurance for a *child* provided if such custodial parent or custodian fails to provide the insurer with a copy of such order, the Commissioner of Social Services may provide the insurer with a copy of such order. Such insurer may thereafter rely on such order and is not responsible for inquiring as to the legal sufficiency of the order. The custodial parent or custodian shall be responsible for providing the insurer with a certified copy of any order which materially alters the provision of the original order with respect to the maintenance of insurance for a *child*. If presented with an insurance reimbursement claim signed by the custodial parent or custodian, such insurer shall reimburse the provider of the medical services, if payment is to be made to such provider under the policy, or shall otherwise reimburse the custodial parent or custodian.

"(e) After the granting of a decree annulling or dissolving the marriage or ordering a legal separation, and upon complaint or motion with order and summons made to the Superior Court by either parent or by the Commissioner of Administrative Services in any case arising under subsection (a) or (b) of this section, the court shall inquire into the *child's* need of maintenance and the respective abilities of the parents to supply maintenance. The court shall make and enforce the decree for the maintenance of the *child* as it considers just, and may direct security to be given therefor, including an order to either party to contract with a third party for periodic payments or payments contingent on a life to the other party. The court may order either parent to name any *child* who is subject to the provisions of subsection (a) or (b) of this section as a beneficiary of any medical or dental insurance or benefit plan carried by such parent or available to such parent on a group basis through an employer or a union.

Statutes § 46b-60,[24] which governs the court's power in annulments, provides that "the Superior Court may make such order regarding any child of the marriage and concerning alimony as it might make in an action for dissolution of marriage. The issue of any void or voidable marriage shall be deemed legitimate. Any child born before, on or after October 1, 1976, whose birth occurred prior to the marriage of his parents shall be deemed a child of the marriage." Thus, like § 46b-84, § 46b-60 uses the term "child" and the phrase "child of the marriage" interchangeably. It is highly unlikely that the legislature, in referring to the powers of the court over minor children, intended those powers to be different depending on whether the complaint seeks a dissolution or annulment of the marriage. We can perceive no rationale for such a distinction, and to read our statutes to create one would be inconsistent with the fundamental principle of statutory construction that we read related statutes to form a consistent, rational whole, rather than to create irrational distinctions. See, e.g., *In re Valerie D.*, 223 Conn. 492, 524, 613 A.2d 748 (1992) (" '[s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law' ");

"(f) Whenever an obligor is before the court in proceedings to establish, modify or enforce a support order, and such order is not secured by a wage garnishment, the court may require the obligor to execute a bond or post other security sufficient to perform such order for support, provided the court finds that such a bond is available for purchase within the financial means of the obligor. Upon failure of such obligor to comply with such support order, the court may order the bond or the security forfeited and the proceeds thereof paid to the state in AFDC cases or to the obligee in non-AFDC cases." (Emphasis added.)

[24] General Statutes § 46b-60 provides: "Orders re children and alimony in annulment cases. In connection with any petition for annulment under this chapter, the Superior Court may make such order regarding any child of the marriage and concerning alimony as it might make in an action for dissolution of marriage. The issue of any void or voidable marriage shall be deemed legitimate. Any child born before, on or after October 1, 1976, whose birth occurred prior to the marriage of his parents shall be deemed a child of the marriage."

*Powers* v. *Ulichny,* 185 Conn. 145, 149, 440 A.2d 885 (1981) ("[w]e make every effort to construe a statutory scheme as a consistent whole"). Similarly, General Statutes § 46b-45a,[25] which governs the situation in which a wife is pregnant during dissolution or annulment proceedings, provides that the "parties may in their pleadings allege and answer that the child born of the pregnancy will or will not be issue of the marriage."

Furthermore, the marital relations statutes consistently draw a linguistic distinction between a "parent" of a child and an interested "third party" with respect to custody of the child. See, e.g., General Statutes § 46b-56 (a)[26] (court may assign custody of child "to the parents jointly, to either parent or to a third party"); General Statutes § 46b-56b[27] (statutory presumption in dispute "involving a parent and a nonparent"); General Statutes § 46b-57[28] (in controversy as to custody of

---

[25] General Statutes § 46b-45a provides: "Allegation of pregnancy in pleadings. Disagreement as to paternity. Hearing. (a) If, during the pendency of a dissolution or annulment of marriage, the wife is pregnant, she may so allege in the pleadings. The parties may in their pleadings allege and answer that the child born of the pregnancy will or will not be issue of the marriage.

"(b) If the parties to a dissolution or annulment of marriage disagree as to whether or not the husband is the father of the child born of the pregnancy, the court shall hold a hearing within a reasonable period after the birth of the child to determine paternity."

[26] See footnote 4 of this opinion.

[27] See footnote 5 of this opinion.

[28] General Statutes § 46b-57 provides: "Third party intervention re custody of minor children. Preference of child. In any controversy before the Superior Court as to the custody of minor children, and on any complaint under this chapter or section 46b-1 or 51-348a, if there is any minor child of either or both parties, the court if it has jurisdiction under the provisions of chapter 815o, may allow any interested third party or parties to intervene upon motion. The court may award full or partial custody, care, education and visitation rights of such child to any such third party upon such conditions and limitations as it deems equitable. Before allowing any intervention, the court may appoint counsel for the child or children pursuant to the provisions of section 46b-54. In making any order under this section the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference."

minor children, if there is "any minor child of either or both parties" court "may allow any interested third party or parties to intervene"); General Statutes § 46b-59[29] (grant of visitation rights with minor child under section "shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted"). This consistent distinction between the rights of parents and third parties further supports our conclusion, drawn from the language of our marital statutory scheme, that the concept of a child of the marriage is implicit in § 46b-56.

The legislative history of § 46b-56 also supports this conclusion. That history indicates that the concept of a child of the marriage has long been embedded in that section, and has been expressed both explicitly, by language such as "children of the marriage," and implicitly, by language such as "children" and "minor children."

Section 46b-56 traces its genealogy to 1837, when the legislature provided for the first time[30] that, incident to

---

[29] General Statutes § 46b-59 provides: "Court may grant right of visitation to any person. The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted. The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights."

[30] By 1821, the legislature had provided jurisdiction in the Superior Court to grant divorces, but it did not provide the authority to award custody of children incident to that power until 1837. See General Statutes (1821 Rev.) tit. 24.

a divorce, the Superior Court could "make such order, as between the parties, for the custody, care and education of the children of the marriage, as such court may deem necessary and proper . . . ." General Statutes (1839) tit. XXIII, § 1 (1837) p. 187. The reference to "children of the marriage" remained in the statute providing for the granting of divorces through the statutory revisions of 1849 and 1866. See General Statutes (1849 Rev.) tit. VII, c. II, § 15; General Statutes (1866 Rev.) tit. 13, c. III, § 38.

In the revision of 1875, the statutes used the phrases "the children" and "minor child of such marriage" interchangeably. In the section providing for awarding custody incident to a divorce, the statute dropped the phrase "of the marriage," and provided that the court may "make any proper order as to custody, care, and education of the children"; General Statutes (1875 Rev.) tit. 14, c. III, § 7; and in the section regarding the support of minor children the statute provided that "the parents of a minor child of such marriage, in need of maintenance, shall maintain it according to their respective abilities . . . ." General Statutes (1875 Rev.) tit. 14, c. III, § 9. There is no indication, however, in the extensive preface to that comprehensive statutory revision that any change in substance was intended by the elimination from one section and the retention in the other section of the phrase "of the marriage," nor can we perceive any reason for such a difference in meaning between the two sections.

In 1883, the legislature enacted Public Acts 1883, c. XXVIII, entitled "An Act concerning the Custody of Children," which provided that in any controversy in the court "between husband and wife as to the custody of minor children of the marriage, the court shall have power to assign the custody of such children to either parent according to its best judgment upon the facts of the case, and upon such conditions and limitations

as it shall deem proper." The legislature amended the act in 1885, providing additional authority in the court to make such awards "when such court is not actually in session . . . ." Public Acts 1885, c. XCIX, § 1. This provision, which contained the language "minor children of the marriage," was carried forward into the 1888 statutory revision, as was the language of the 1875 revision providing, in divorce cases, for orders "as to custody, care, and education of the children . . . ." General Statutes (1875 Rev.) tit. 14, c. III, § 7; General Statutes (1888 Rev.) §§ 2809, 2811. The interchangeable use of the phrases "of the children" and "minor children of the marriage" remained in the statutes through the general statutory revisions of 1902, 1918, 1930, 1949 and 1958. See General Statutes (1902 Rev.) §§ 4558, 4560, 4561; General Statutes (1918 Rev.) §§ 5289, 5291, 5292; General Statutes (1930 Rev.) §§ 5184, 5186, 5187; General Statutes (1949 Rev.) §§ 7337, 7339, 7340; General Statutes (Rev. to 1958) §§ 46-23, 46-24, 46-26. Indeed, it continued until the eve of the extensive amendments to our divorce laws effected by the legislature in 1973. See General Statutes (Rev. to 1972) §§ 46-23, 46-24, 46-26.[31]

---

[31] General Statutes (Rev. to 1972) § 46-23 provides: "Order as to custody of children; visitation rights. On any complaint for a divorce, the court may, at any time, make any proper order as to the custody, care and education of the children and may, at any time thereafter, annul or vary such order. In the discretion of the court, reasonable visitation rights may be granted to any person having an interest in the welfare of the child."

General Statutes (Rev. to 1972) § 46-24 provides: "Court may assign custody of children to either party. In any controversy before the superior court between husband and wife as to the custody of minor children of the marriage, the court may assign the custody of any of such children to either parent according to its best judgment upon the facts of the case, and upon such conditions and limitations as it deems equitable; and, when such court is not in session, any judge thereof may, prior to any action in the premises by the superior court, make any order which he deems reasonable as to the care, custody and maintenance of any such minor children during the pendency of the cause, and make any other order in the cause, including orders of injunction, and any such order may afterwards be set aside or altered by such court or by such judge when such court is not actually in session."

In 1973, by No. 73-373 of the 1973 Public Acts (P.A. 73-373), the legislature effected an historic revision of our marital dissolution statutes.[32] That legislation introduced certain new concepts to our family law, such as the irretrievable breakdown of the marriage as a ground for dissolution. See General Statutes (Rev. to 1975) § 46-48, now § 46b-51. Throughout that legislation, however, the legislature continued to use various terms—such as "minor children of the marriage," "minor children," and "minor children of the parties"—interchangeably, without any indication, either in the language of the legislation or in its legislative history that different meanings were intended by the slight linguistic differences.[33] Thus, the legislature continued the prior legislative practice of referring to children, in the context of

General Statutes (Rev. to 1972) § 46-26 provides: "Support of children. Upon the dissolution of any marriage by divorce, the parents of a minor child of such marriage, who is in need of maintenance, shall maintain such child according to their respective abilities, and, upon the complaint of either parent made to the superior court, or upon motion, with order and summons, made to the superior court in any such case by either parent or by the commissioner of finance and control subsequent to the granting of a decree of divorce, it shall inquire into their pecuniary ability and may make and enforce such decree against either or both of them for the maintenance of such child as it considers just, and may direct security to be given therefor."

[32] Indeed, in that legislative endeavor the form of the court's action was changed from a "divorce" to a "dissolution." See P.A. 73-373, § 1 (c) (referring to "[a] decree of dissolution of a marriage").

[33] For example, § 6 of P.A. 73-373, governing requests for conciliation upon the filing of a complaint for dissolution, referred to "the counsel for any minor children of the marriage . . . ." Section 8 of P.A. 73-373, governing the procedure deemed to be adequate for an uncontested dissolution, referred to the "support of their children . . . ." Section 13 of P.A. 73-373, governing the closing of the courtroom "in the interests of justice and the persons involved," referred to the "counsel for any minor children . . . ." Section 15 of P.A. 73-373, governing the court's power to award custody incident to the filing of complaint for dissolution, annulment or legal separation, provided that "[o]n the filing of [such a] complaint . . . and in any controversy before the superior court between a husband and wife or former husband and wife as to the custody or care of their minor children, the court may" make any proper order relative to the custody, care, education visitation and support "of such children . . . ." Section 16 of P.A. 73-373, governing the appointment of counsel for minor children, referred to "a

a marital dissolution case, by terms that both explicitly and implicitly referred to the concept of a child of the marriage. These different linguistic formulations remain scattered throughout our current marital dissolution statutes. See, e.g., General Statutes §§ 46b-51 (a), 46b-53 (a), 46b-54 (a), 46b-56 (a), 46b-57, 46b-60, 46b-61, 46b-62, 46b-66 and 46b-84.

We ordinarily do not infer a legislative intent to change longstanding and fundamental legislative policies without a clear indication of such an intent. See, e.g., *State* v. *Cobb*, 234 Conn. 735, 750, 663 A.2d 948 (1995). There is no indication, however, that in the context of a marital dissolution case the legislature meant to eliminate from those statutes the longstanding concept of a child of the marriage. Indeed, the legislative history that *does* touch on this issue indicates that the legislature assumed that the legislation continued to embody the notion of children of the marriage. See, e.g., 16 S. Proc., Pt. 3, 1973 Sess., p. 1408, remarks of Senator George C. Guidera ("[t]he bill also provides that the court may, not shall, appoint counsel for the

minor child or minor children of the parties, or either of them . . . ." Identical language appeared in § 17 of P.A. 73-373, governing intervention of interested third parties in custody disputes. Section 18 of P.A. 73-373, governing written stipulations regarding custody, referred to "the parties" and "any of their children . . . ." Section 19 of P.A. 73-373, governing the venue in cases in which the parties live in different judicial districts, referred to orders regarding the custody and care "of any minor child of the parties . . . ." Section 24 of P.A. 73-373, governing the legitimacy of children of an annulled marriage, provided that the court "may make such order in relation to any child of the marriage and concerning alimony as it might make in an action for dissolution of marriage and the issue of any void or voidable marriage shall be deemed legitimate." Section 26 of P.A. 73-373, governing the support of minor children, provided that, upon the entry of a decree of annulment, dissolution or legal separation, "the parents of a minor child of the marriage, which child is in need of maintenance, shall maintain such child according to their respective abilities. . . ." Section 27 of P.A. 73-373, governing attorneys' fees for minor children, provided that "the court may order the father or mother, or both, of such child to pay the reasonable fees of such attorney . . . ."

children [of] the marriage"); 16 H.R. Proc., Pt. 4, 1973 Sess., p. 1466, remarks of Representative James F. Bingham ("counsel may be appointed to protect the interests of the children of the marriage"); id., p. 1479, remarks of Representative Alan H. Nevas ("this bill . . . [is] going to provide dignity for the parties involved and it's going to provide supportive measures for the children of these marriages").

Although the statutes have never explicitly defined the contours of the concept of a "child of the marriage," our cases have interpreted that concept in a consistent manner, both before and after the historic 1973 revision. A review of that case law, read in connection with certain other statutory developments, leads us to conclude that the meaning of that concept, in the context of a marital dissolution case, is limited to a child conceived by both parties, a child adopted by both parties, a child born to the wife and adopted by the husband, a child conceived by the husband and adopted by the wife, and a child born to the wife and conceived through artificial insemination by a donor pursuant to §§ 45a-771 through 45a-779. See footnote 16 of this opinion. Those sources also lead us to conclude that, although initially the concept of a child of the marriage imposed jurisdictional limitations on the power of the court to award custody of a minor child who did not fit within that concept, those jurisdictional limitations have been overtaken by statutory amendments that give a dissolution court the power to award custody of such a child to an interested third party. The concept of a child of the marriage, as established by our statutory and interpretive jurisprudence, however, continues to define who is a parent of the child for purposes of the ultimate custody determination.

In *LaBella* v. *LaBella*, supra, 134 Conn. 312, the husband and wife were childless, and had discussed adoption. While on a business trip, the husband wrote to

the wife that he had found a baby that they could adopt. The wife told him to bring the baby home, which he did. The next year, the husband disclosed to the wife that the child was, in fact, his child—the issue of an adulterous relationship. Id., 314. In the subsequent divorce action between them, this court held that: (1) divorce is a "creature of statute"; id., 316; (2) the applicable divorce statutes "refer to children of the marriage in terms or by implication"; id.; and (3) the child "is not a child of this marriage." Id. Thus, we concluded that, under the statutory scheme as it then existed, the Superior Court did not have jurisdiction in the divorce action to award custody of the minor child. Id., 316–17.[34]

In *Morrow* v. *Morrow*, 165 Conn. 665, 345 A.2d 561 (1974),[35] the wife and husband had been married in Scotland in 1964. At the time of the marriage, the wife had a one year old child born out of wedlock. Although the husband had expressed interest in adopting that child, the parties decided that they could not afford an adoption. Instead, in 1965, they followed a Scottish procedure by which the husband, in the wife's presence, swore before a sheriff that he was the child's father, and the child's birth records were then changed to indicate that fact. Id., 667. Thereafter, the husband treated the child as his own. The divorce action, in the Superior Court, took place five years later, in 1970. The trial court granted custody of the child to the husband. Id.

On appeal, this court reversed the judgment of the trial court and concluded that the trial court "lacked

[34] We also held that the Probate Court, and not the Superior Court, had jurisdiction over the child for purposes of awarding custody. *LaBella* v. *LaBella*, supra, 134 Conn. 316–17. As we explain in the text of part III of this opinion, that particular jurisdictional allocation no longer holds true, because § 46b-56 confers jurisdiction on the Superior Court over "any controversy . . . as to the custody or care of minor children," and because even in a dissolution action the court may award custody to an interested third party.

[35] We note that, as the attorney general points out, the trial court judgment in *Morrow* was rendered in 1971, before the enactment of § 15 of P.A. 73-373, which expanded the jurisdiction of the Superior Court in dissolution cases.

jurisdiction to award custody of [the child] to the [husband]." Id., 670. The court stated that the "trial court had no jurisdiction to award custody of [the child] to the [husband] if she is not his child by paternity or adoption." Id., 668. In addition to *LaBella*, the court relied on General Statutes (Rev. to 1972) § 46-26a, now § 46b-58, which "expanded the jurisdiction of the Superior Court, by providing that '[t]he authority of the [S]uperior [C]ourt to make and enforce orders and decrees as to . . . custody . . . is extended to children adopted by both parties and any natural child of one of the parties who has been adopted by the other.' " *Morrow* v. *Morrow*, supra, 165 Conn. 668–69. The court stated: "Unless [the child] is deemed by law to be a child of the marriage of the [husband] and the [wife], the Superior Court was without jurisdiction over her person." Id., 669.[36] The court determined that "[o]n the undisputed facts of this case and the applicable law, we conclude that [the child] is not the legitimate child of the [husband] and that the court lacked jurisdiction to award custody of [the child] to the [husband]." Id., 670.

*Remkiewicz* v. *Remkiewicz*, 180 Conn. 114, 429 A.2d 833 (1980), involved a marital dissolution action between a wife, who had had a minor child by a former marriage, and her husband. During their marriage, the husband had filed an affidavit of parentage of the child, changing her birth certificate to reflect his paternity and changing her last name to his. Id., 116. During the marriage, the child regarded the husband as her father, and he treated her as his child, publicly acknowledging her as such and claiming her as a tax exemption. Id. The attorney general became a party to the dissolution action because the wife had been receiving public assistance, and moved for an order of support against the

---

[36] The court also rejected the husband's argument, which the trial court had adopted, that his wife was estopped from recanting his declaration under oath in Scotland. *Morrow* v. *Morrow*, supra, 165 Conn. 669.

husband. Id., 115. The trial court held that it had no jurisdiction to issue such an order because the husband was "neither the natural nor adoptive parent of [the child] . . . ." Id., 116.

This court affirmed. We held that the trial court had no authority "to issue [an order of support] against a husband who was neither the biological nor adoptive parent of the child for whom support was sought." Id., 116–17. We stated that "the power of the Superior Court to dissolve a marriage emanates wholly from statute," and that its "further authority to issue any order as to the custody, care and education of the minor children of the parties, as an incident of the dissolution action, is also governed by statute." Id., 117. We then noted that authority "exists, under General Statutes [§ 46b-58] . . . to order support for minor children, including children adopted by both spouses and natural children of one spouse who are adopted by the other." Id. The court also stated that the duty of support "is one imposed on parents," and that the husband was not the child's "parent because he was not her biological father, he was not her father by adoption, nor was he adjudged to be her father by" any of the statutory paternity provisions. Id. Finally, the court confronted the state's public policy argument based on the husband's written acknowledgment of paternity. The court stated: "In this case, however, public policy cuts two ways. The adoption statutes . . . express a legislative intent that no person shall acquire parental status unless certain formalities are observed. A parent has rights as well as duties. If a stepfather could acquire parental rights through the simple expedient of changing his stepchild's birth certificate, all sorts of mischief could result." Id., 120.

These cases stand for several propositions. First, the court's power to adjudicate custody derives from statute, and cannot be expanded by equitable concerns.

Second, the concept of "child of the marriage" defines who is a parent for purposes of awarding custody in a dissolution action. The child of the marriage and the parent of the child are two sides of the same coin. Third, that concept derives from interpretations of the relevant statutes and not from common-law adjudication by this court. Thus, it confines the meaning of parentage to a child conceived by both of the parties,[37] or to a child who either had been adopted by both parties or was a natural child of one party who had been adopted by the other.[38] Fourth, under these cases, the concept of "child of the marriage," and its corresponding definition of parentage, imposed jurisdictional limitations on the trial court's power to enter custody orders in dissolution cases. If the child was not a "child of the marriage"— that is, if both parties were not parents of the child, within the meaning of our statutes—the court had no jurisdiction to render such orders.

The first three of these propositions remain part of our dissolution jurisprudence. In the absence of some powerful reason to overrule those precedents and a principled doctrine with which to replace them—particularly given that they have long been in existence without legislative disapproval—we would not be justified in doing so. See *Conway* v. *Wilton*, 238 Conn. 653, 682–83, 680 A.2d 242 (1996) (*Peters, C. J.*, dissenting) ("[o]nce an appropriate interval to permit legislative

---

[37] This includes, of course, a child conceived by both parties and born prior to the parents' marriage. General Statutes § 46b-60.

[38] We have, in effect, also applied this definition of parent in determining the closely related question of who has standing to bring a habeas corpus action for custody of a minor child. *Weidenbacher* v. *Duclos*, 234 Conn. 51, 62–63, 661 A.2d 988 (1995) (parent includes biological or adoptive parent, but not foster parent, absent legislative declaration to contrary); see also *Nye* v. *Marcus*, 198 Conn. 138, 143–44, 502 A.2d 869 (1985); *Doe* v. *Doe*, 163 Conn. 340, 344–45, 307 A.2d 166 (1972).

The legislature has expanded the concept by enacting chapter 803a of the General Statutes, discussed more fully later in the text of this opinion, governing conception by heterologous artificial insemination.

reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision . . . especially . . . when the precedent involved concerns the interpretation or construction of a statute" [citation omitted; internal quotation marks omitted]).

The fourth proposition, however, namely, that the definition of parenthood imposes a *jurisdictional* limitation on a dissolution court with regard to custody determinations, stands on a different footing. That proposition has been overtaken by legislation enacted as part of the 1973 revision of the dissolution statutes.

Prior to P.A. 73-373, although our dissolution statutes gave the court the jurisdiction to award to a third party *visitation* rights regarding a child of the marriage; General Statutes (Rev. to 1972) § 46-23;[39] they limited the court's jurisdiction to award *custody* of such a child to the parents of the child. General Statutes (Rev. to 1972) § 46-24;[40] *Michaud* v. *Wawruck*, 209 Conn. 407, 413, 551 A.2d 738 (1988) ("[o]ur statutes recognize that visitation encompasses considerations that differ from those that govern custody"). These cases reflected that limitation.[41]

Section 15 of P.A. 73-373, however, eliminated that limitation by expanding the Superior Court's jurisdiction to include the power to award custody of a child of the marriage to a third party. As codified in General

---

[39] See footnote 31 of this opinion.

[40] See footnote 31 of this opinion.

[41] Those cases were decided without reference to P.A. 73-373. *LaBella* and *Morrow* were decided on the basis of pre-1973 statutes. See footnote 35 of this opinion. Although *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 114, was decided in 1980, the issue in that case was the definition of parentage for purposes of imposing a support order, and not whether the court had jurisdiction to award custody of the child to a third party.

Statutes (Rev. to 1983) § 46b-56, after having been amended by No. 80-29 of the 1980 Public Acts[42] and No. 81-402 of the 1981 Public Acts,[43] that legislation provides in relevant part: "Subject to the provisions of section 46b-56a, the court may assign the custody of any child to the parents jointly, to either parent *or to a third party*, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. . . ." (Emphasis added.)

The legislative history of P.A. 73-373 supports the conclusion that this language was intended to expand the court's jurisdiction in regard to custody orders in a dissolution case. See 16 H.R. Proc., supra, p. 1464, remarks of Representative Bingham ("[t]he only change [made by] the bill . . . in the area of custody is that the court is given the right to assign custody to someone other than a parent if it is in the best interests of the children").

In *Manter* v. *Manter*, 185 Conn. 502, 441 A.2d 146 (1981), we considered the question of third party intervention to seek custody of a child in a dissolution case pursuant to § 46b-57.[44] That section procedurally supplements the third party provision of § 46b-56, by authorizing, although not requiring, the formal intervention in a dissolution case of an interested third party whose interest may not already be before the court. *Cappetta* v. *Cappetta*, 196 Conn. 10, 12–15, 490 A.2d 996 (1985). Observing that the court's paramount consideration in a custody matter is the child's welfare; *Manter* v. *Manter*, supra, 507; we stated that the court

---

[42] Number 80-29 of the 1980 Public Acts added the provision in § 46b-56 authorizing assignment of joint custody in dissolution proceedings.

[43] Number 81-402, § 1, of the 1981 Public Acts provided that the court is subject to the provision of § 46b-56a in assigning custody and changed the order of possible custody assignments so that "to the parents jointly" is listed first.

[44] See footnote 28 of this opinion.

may employ a flexible test in determining the varieties of interest that would authorize such an intervention, that those interests would not necessarily be confined to the traditional nuclear family model, and that they could include "such nontraditional parties as stepparents where the child's welfare dictated that result." Id., 508. Similarly, we have read *Manter* as indicating that "the [intervening] movant's status as a former adoptive parent would not otherwise have been a disqualification automatically barring him from custody in an appropriate case." *Cappetta* v. *Cappetta*, supra, 14. We have also recognized that, for purposes of third party custody and visitation determinations, "[t]raditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents," and we should not "assume that the welfare of children is best served by a narrow definition of those whom we permit to continue to manifest their deep concern for a child's growth and development." *Michaud* v. *Wawruck*, supra, 209 Conn. 415.

The foregoing analysis demonstrates that: (1) the plaintiff is not a parent of the child within the well established definition of that term in our marital dissolution law; (2) she is, however, a third party who comes well within the ambit of § 46b-56 for consideration as a third party claimant to custody of the child; and (3) there is no jurisdictional barrier to that consideration by the trial court. The trial court's conclusion, therefore, that it had no jurisdiction to consider the custody of the child was flawed, and the case must be remanded to that court for full consideration of the merits of the custody dispute, under the appropriate standards.

Before addressing those standards, however, we briefly and explicitly address certain of the contentions of the parties, the amici, and the concurring and dissenting opinion. First, implicit in our analysis is that

we reject the "equitable parent" doctrine.[45] Using purely equitable concerns to reformulate the definition of parentage under our dissolution statutes would be inconsistent with our entire jurisprudence in the area of marital dissolution, which, as discussed, locates the source of judicial power in those statutes, and not in the court's common-law powers of equity. Although, as we have stated, the court has broad equitable powers under those statutes; see *Pasquariello* v. *Pasquariello*, supra, 168 Conn. 585; it is clear that those powers concern the court's authority to fashion appropriate remedies, and they have never been construed to permit the court to define parentage. Indeed, in both *LaBella* and *Morrow*, the unsuccessful adult who sought custody would have qualified under the most prominent formulation of that doctrine; see footnote 45 of this opinion; but those claims to custody were rejected by this court as a matter of statutory interpretation. Furthermore, acceptance of the equitable parent doctrine would also

---

[45] The term "equitable parent" was coined by the Michigan Court of Appeals in *Atkinson* v. *Atkinson*, 160 Mich. App. 601, 408 N.W.2d 516 (1987). The Michigan court held that a father, who, until it was determined during a divorce proceeding that he was not the biological father of a four year old boy conceived by and born to his wife during the marriage, considered himself to be the child's father, could nonetheless seek custody of the child as his "equitable parent." Id., 608–609. As defined by the Michigan court, that doctrine grants parental status, for purposes of custody in a marital dissolution case, to an adult who is neither a biological nor adoptive parent where (1) the adult and child mutually acknowledge a parent-child relationship, or the adult has cooperated in the development of such a relationship over a period of time, (2) the adult desires to have parental rights, and (3) the adult is willing to take on the responsibility of raising the child. Id.

Similar concepts, although not always using the same terminology, have been employed by other courts. See, e.g., *Carter* v. *Brodrick*, 644 P.2d 850, 855 (Alaska 1982) (relationships that affect child "based upon psychological rather than biological parentage" protected through custody); *In re Marriage of Gallagher*, 539 N.W.2d 479, 481–82 (Iowa 1995) (adopting modified *Atkinson* test); *State in Interest of J.W.F.*, 799 P.2d 710, 714 (Utah 1990) (stepfather has standing to seek custody under best interest test); *In re Marriage of D.L.J. & R.R.J.* v. *R.J.*, 162 Wis. 2d 420, 427–28, 469 N.W.2d 877 (1991) (applying *Atkinson* test, nonbiological father who fulfilled parental duties granted equitable parent status for custody determination).

be inconsistent with our statutory scheme for adoption. See General Statutes §§ 45a-706 through 45a-765. A court is not at liberty to bestow parental status independent of that scheme. *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 120 ("adoption statutes . . . express a legislative intent that no person shall acquire parental status unless certain formalities are observed").[46] Finally, as we explain further in part IV of this opinion, where, as in this case, there is a custody disagreement between a parent and an interested third party with a powerful claim to custody, our statutes afford sufficient flexibility and discretion to the trial court to recognize that claim,

---

[46] Moreover, even if we were to conclude that our statutes left room for a redefinition of parentage, we are not persuaded that it would be wise to employ the equitable parent doctrine in that fashion. It is true that the doctrine has considerable emotional appeal, because it permits a court, in a particularly compelling case, to conclude that, despite the lack of biological or adoptive ties to the child, the deserving adult nonetheless may be determined to be the child's parent. This appeal may be enhanced in a given case because the best interests of the child, if determined irrespective of the otherwise invalid claim of parentage, may point in that direction. That doctrine, however, would lack the procedural and substantive safeguards provided to the natural parents and the child by the adoption statutes. In addition, the equitable parent doctrine, which necessarily requires an ad hoc, case-by-case determination of parentage after the facts of the case have been determined, would eliminate the significant degree of certainty regarding who is and who is not a child's parent that our jurisprudence supplies.

Consider, for example, the case of a widow who has remarried, to a man whom she considers to be her infant's *stepfather*. Nonetheless, for the child's well-being, she cooperates in raising the child to consider her husband as the child's father, but formal adoption has not yet occurred. Perhaps the mother is waiting to see how the marriage works out before consenting to the adoption of her child by her husband. When a dissolution action ensues, however, the husband would have a powerful claim under the equitable parent doctrine to *parentage* of the child, notwithstanding that the mother never consented to his attaining that legal status. Even if the husband were not serious about pressing the claim, he could use it as leverage at the marital dissolution bargaining table.

Another difficulty with the equitable parent doctrine, at least in its most prominent formulation; see footnote 45 of this opinion; is that it leaves the question of parentage to the choice of the purported equitable parent. It is, in our view, a perverse notion of parenthood that makes such a status depend on whether one wants its responsibilities as well as its rights.

without the necessity of creating the legal fiction of an "equitable parent."

We also reject the claim of the plaintiff and the attorney for the child, which the academy joins; see footnote 17; that the defendant is estopped from denying that the child is the issue of the marriage. In *Morrow* v. *Morrow*, supra, 165 Conn. 669, we rejected, as not supported by the record, the trial court's determination that the husband had been estopped from recanting his declaration of parentage before the Scottish sheriff. In doing so, we noted that estoppel requires proof of two facts: (1) misleading conduct by one party; and (2) detrimental reliance thereon by the other party. Id. Likewise, the record in the present case does not support a finding of estoppel. Despite the plaintiff's claim in her brief that she did not pursue an adoption of the child because of the defendant's assurance to her that she was the child's mother, there is no such evidence in this record from which such an inference could be drawn.[47]

[47] To the extent that any such adoption by the plaintiff might have required the cooperation of the surrogate, the record does not support an inference that such cooperation would have been easily secured. Indeed, if anything, the record demonstrates to the contrary. On June 27, 1983, less than three months after the birth of the child, the surrogate wrote a letter to the parties expressing deep "hurt" that they had not carried out what she regarded as assurances that their relationship was more than a "business deal," and that they would visit her and send her pictures of the baby.

Moreover, on May 2, 1990, when the child was seven years old, the surrogate wrote to the defendant. In that letter, the surrogate revealed that she had recently suffered the death of a daughter, and asked for the defendant's help in her going to Florida to be inseminated by another man in order to conceive another child. In the course of doing so, however, the surrogate revealed that she still considered the child in this case to be hers and the defendant's, and not the plaintiff's, making references to: "my longing to see our daughter"; the possibility of seeking visitation privileges with the child; getting "my thoughts off the daughter we have that I never got to know"; and her desire that the plaintiff not visit her because the plaintiff "is not a part of this as far as I am concerned, and I don't wish to be patronized by her. What I feel is my business, and my privilege. My feelings towards our daughter concern you and I, and no one else."

The record also discloses that, to the extent that the plaintiff relied on an estoppel doctrine in the trial court, she did not do so in accordance with

The plaintiff's claim that the trial court's conclusion that it lacked jurisdiction deprived her of equal protection of the laws must fail because of our conclusion that the trial court did have jurisdiction to adjudicate the child's custody. On remand, the trial court will be required to exercise its custody jurisdiction.

The plaintiff's claim that the trial court was required by the child's best interests to adjudicate her custody is simply contrary to basic jurisprudential notions. The court must first have jurisdiction in regard to the custody determination before deciding where the child's best interests require custody to be located. In any event, on remand, the child's best interests will be the critical factor for the court's consideration in that custody determination.

We also reject the claim of the plaintiff and the child's attorney that the child's birth certificate conclusively established that the plaintiff is her mother. One does not gain parental status by virtue of false information on a birth certificate. See *Remkiewicz* v. *Remkiewicz,* supra, 180 Conn. 120 ("[i]f a stepfather could acquire parental rights through the simple expedient of changing his stepchild's birth certificate, all sorts of mischief could result").

Finally, we reject the reliance of the plaintiff and the child's attorney on §§ 45a-771 through 45a-779.[48] Those statutes govern the rights and status of children born

the doctrine as articulated in *Morrow,* and made no attempt to persuade the trial court of the factual assertion that she now raises on appeal, namely, that the defendant misled her into not seeking to adopt the child. In her posttrial brief, she did not cite *Morrow* or any other Connecticut case on estoppel, and did not point to any such evidence in support of an estoppel claim. That part of her trial brief was devoted to a discussion of *In re Marriage of Hinman,* 6 Cal. App. 4th 711, 8 Cal. Rptr. 2d 245 (1992), which does not rely on estoppel in the sense that our jurisprudence has recognized it.

[48] See footnote 16 of this opinion.

through, and husbands and wives who consent to, the process of "heterologous artificial insemination, or artificial insemination with the semen of a donor," referred to as "A.I.D." General Statutes § 45a-772. They provide that "children born as a result of A.I.D. shall be deemed to acquire, in all respects, the status of a naturally conceived legitimate child of the husband and wife who consented to and requested the use of A.I.D." General Statutes § 45a-774.

Recognizing that the plaintiff in this case does not come within the terms of these statutes, the plaintiff and the child's attorney argue that the policy and legislative intent behind them support the plaintiff's claim of parentage. We disagree. These statutes are intended to codify, with respect to a child conceived as a result of A.I.D., "the public policy of this state . . . that every child born to a married woman during wedlock is legitimate." General Statutes § 45a-771 (a). Thus, to the extent that these statutes could be considered as having a public, policy effect beyond their terms, that policy would have legitimized the child as the child of the surrogate and her then husband; it could not have created parentage in the plaintiff.

We summarize the main points of the dissenting portion of the concurring and dissenting opinion in order to respond to it. First, the concurring and dissenting opinion agrees that, as a matter of statutory interpretation, the concept of "child of the marriage" is incorporated into § 46b-56 (a). The analysis of that opinion diverges from ours, however, starting with the proposition that, historically, the concept of the "child of the marriage," as incorporated in § 46b-56 (a), was "to distinguish between illegitimate and legitimate offspring." That opinion then asserts that "[c]hildren who otherwise might have been deemed illegitimate were presumed *at common law* to be 'children of the marriage' if they were born to the wife during the course of the

marriage or, if born prior to the marriage, they were adopted by the nonbiological parent." (Emphasis added.) For these propositions, the opinion cites several authorities, principally *Morrow* v. *Morrow*, supra, 165 Conn. 668–69, 84 A.L.R.4th 655, 679–84 (1991), note, "Presumption of Legitimacy of a Child Born in Wedlock," 33 Harv. L. Rev. 306 (1919–20), and J. Ayer, Jr., "Legitimacy and Marriage," 16 Harv. L. Rev. 22, 23 (1902–1903).

The concurring and dissenting opinion then derives from the history of the dissolution statutes a legislative recognition "that there are certain factual circumstances under which a child who is the biological or adopted child of only one of the parties to the marriage is nonetheless considered a 'child of the marriage' for the purposes of determining . . . custody." That opinion then asserts that the "historical significance" of the concept of the child of the marriage "obliges the court to expand the term 'child of the marriage' beyond the gatekeeping function assigned to it by the majority." The concurring and dissenting opinion concludes that, although § 46b-56 continues to require that the subject of a custody dispute be a "child of the marriage," it "no longer requires that in every case the child be the biological or the adopted child of both parties to the marriage."

The concurring and dissenting opinion then attempts to explain away the conflict between this conclusion and *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 114, *Morrow* v. *Morrow*, supra, 165 Conn. 665, and *LaBella* v. *LaBella*, supra, 134 Conn. 312, by distinguishing those cases on the basis that their holdings "are inapposite to the facts of this case, in which the *parties were married to raise this child* . . . ."[49] (Emphasis added.)

---

[49] In this regard, the concurring and dissenting opinion makes the curious statement that "[t]o the extent that the majority implicitly acknowledges the importance of common-law equitable considerations in deciding who

In this connection, the concurring and dissenting opinion also asserts that "*[b]oth the plaintiff and the defendant intended from the time the child was conceived* that they should be the only mother and father the child ever knew." (Emphasis added.) Finally, the opinion concludes that the child should be considered a child of the marriage because, "[a]lthough the parties failed to finalize their relationship with the child through the proper probate procedures," it is clear that they intended that the plaintiff should have all the rights and responsibilities of a mother.

The reasoning of the concurring and dissenting opinion is flawed. First, there is little evidence for its historical assertion that the purpose of the concept of the child of the marriage, as used in § 46b-56 (a), was to distinguish between legitimate and illegitimate children.

For example, the reference to *Morrow* is unavailing in this regard. Although *Morrow* did, in quoting from *LaBella* v. *LaBella*, supra, 134 Conn. 316, refer to the fact that the mother is the guardian of the person " 'of an illegitimate child' "; *Morrow* v. *Morrow*, supra, 165 Conn. 668; that hardly establishes the proposition that, when the legislature started using the term "child of the marriage" in 1837, its purpose was to distinguish between legitimate and illegitimate children. Moreover, the reference in the concurring and dissenting opinion to *Morrow* v. *Morrow*, supra, 669, to support its assertion that "[c]hildren who otherwise might have been deemed illegitimate were presumed *at common law* to

is a parent, I agree that we should not disavow equitable considerations." We do not acknowledge, either explicitly or implicitly, any such considerations. In fact, we explicitly disavow the notion that, under our established dissolution jurisprudence, equitable considerations are an appropriate factor in deciding who is a parent. That is the whole point of our discussion of the history of the interpretation of the dissolution statutes, and of our rejection of the notion of the "equitable parent" doctrine.

be 'children of the marriage' . . . if born prior to the marriage, they were adopted by the nonbiological parent," is erroneous. (Emphasis added.) In fact, in discussing children born prior to the marriage and subsequently adopted, the court referred, not to any common-law principle regarding legitimacy, but to then General Statutes § 46-26a. The court noted that "[o]ur present statutes have expanded the jurisdiction of the Superior Court, by providing that '[t]he authority of the superior court to make and enforce orders and decrees as to . . . custody . . . is extended to children adopted by both parties and any natural child of one of the parties who has been adopted by the other.' General Statutes § 46-26a." *Morrow* v. *Morrow*, supra, 668–69.

If anything, this reference reinforces our view that the concept of parentage under our dissolution statutes has developed legislatively, rather than by a process of case-by-case judicial lawmaking based on equitable principles. Indeed, the concurring and dissenting opinion cannot cite one case, because there is none, in our more than 160 years of statutory dissolution jurisprudence, in which the court, rather than the legislature, has expanded the definition of a child of the marriage. Additionally, whenever such a judicial expansion has been sought, the court has reiterated the principle that our power over custody matters derives from the statutes.

Moreover, the other authorities that the concurring and dissenting opinion marshals for its historical assertion do not strongly support it. Although the two Harvard Law Review articles cited in that opinion discuss the law of legitimacy of children in great detail, neither of them refers in any way to the concept of a "child of the marriage."[50] See note, supra, 33 Harv. L. Rev. 306; J. Ayer, Jr., supra, 16 Harv. L. Rev. 22.

---

[50] Likewise, the reference to 84 A.L.R.4th 655, 679–84 (1991), provides little support for the analysis in the concurring and dissenting opinion. Only

Second, even if we were to accept the assertion that, originally, the legislative purpose of the concept of the child of the marriage was to differentiate between legitimate and illegitimate children, that does not mean, as the concurring and dissenting opinion suggests, that we are free to jettison what has become its established meaning and jurisprudence, and to supply a new meaning contrary to that jurisprudence. As we have indicated, the history of our dissolution statutes makes clear that, despite what might be the historical origins of the concept of a child of the marriage, its statutory function for many decades has been to define who is a parent for purposes of determining custody in a dissolution action. That history also establishes that our power to adjudicate custody derives from statute and not from considerations of equity, and that, despite the suggestion of the concurring and dissenting opinion to the contrary, the meaning of the concept of a child of the marriage has been the result of statutory amendment and interpretation and not common-law adjudication unfettered by statutory interpretation. Indeed, it was not until 1976, when the legislature enacted what is now the last sentence of § 46b-60,[51] that a child born to an unmarried couple who later married was "deemed a child of the marriage." Thus, we disagree with the contention in the concurring and dissenting opinion that, despite this history, we are "obliged"—the opinion does not explain the source of this obligation—to expand the concept beyond its established meaning.

two of the cases annotated therein mention child of the marriage. See *Nelson* v. *Nelson*, 10 Ohio App. 3d 36, 37, 460 N.E.2d 653 (1983) (noting that statute conferring jurisdiction to determine custody of "children of the marriage" was understood to confer such jurisdiction as to "legitimate" offspring); *John M.* v. *Paula T.*, 524 Pa. 306, 313 n.2, 571 A.2d 1380 (1990) (giving notice, in footnote, that *henceforth* it would use phrase " 'presumption that a child born to a married woman is a child of the marriage,' " instead of " 'illegitimate' " child).

[51] See footnote 24 of this opinion.

Third, the factual underpinnings of the conclusion in the concurring and dissenting opinion that the child in this case is a "child of the marriage" is not supported by the record. That opinion brings this child within that language by its factual assertions that "the parties were married to raise this child," and that "the [parties] intended from the time the child was conceived that they should be the only mother and father the child ever knew." There are no such findings by the trial court, however, and neither the evidence nor the court's findings necessarily imply these facts. The court found that, although both parties desired to have children, *"the defendant clearly expressed his determination to have a child, with or without the plaintiff's cooperation."* (Emphasis added.) Consistent with that determination, the court also found that it was the *defendant* who sought the surrogate through the newspapers. Furthermore, it is undisputed that the parties' marriage did not take place until approximately four months after the child was conceived. Thus, it cannot be definitively said on the basis of this record that the purpose of this marriage was to raise this child, or that when the child was conceived both the plaintiff and the defendant intended that they would both be the only parents that the child would ever know. Although those would have been permissible inferences, had the court drawn them, they are not necessary inferences from either the findings or the undisputed evidence. We simply do not know what specifically was in the defendant's mind, regarding marriage to the plaintiff, when the artificial insemination took place.

Indeed, the reliance of the concurring and dissenting opinion on these assertions—that the purpose of this marriage was to raise this child and that, therefore, this is a "child of the marriage"—demonstrates the fragility of the reasoning of that opinion. Had the parties been married and without children for two or three years,

and *then* decided that they wanted a child and went through the same surrogacy arrangement and child rearing, under the rationale of the concurring and dissenting opinion it could *not* be said that the parties were married in order to raise the child. Presumably, therefore, under that scenario the child would *not* be a "child of the marriage." It is difficult to see, however, why in principle that child would be any more or less a child of the marriage than the child in this case. This inconsistency demonstrates that the concurring and dissenting opinion really relies on its own unarticulated version of the equitable parent doctrine, despite its disavowal of that doctrine.

Fourth, the concurring and dissenting opinion passes over the pertinence of our adoption statutes with only a passing reference to the parties' "fail[ure] to finalize their relationship with the child through the proper probate procedures." Our adoption statutes embody significant substantive and procedural requirements that the legislature has mandated must be met before one may become an adoptive parent. See General Statutes §§ 45a-706 through 45a-765. These requirements rest on important public policies for the protection of all concerned—the child, the biological parents and the adoptive parents. The concurring and dissenting opinion, through what may be a laudable desire to supply a "legal" mother for this child for purposes of § 46b-56, ignores those statutes and the public policies on which they rest, and in effect would validate a kind of de facto adoption in this case. We decline to do so.

At bottom, despite its disavowal of the equitable parent doctrine, the concurring and dissenting opinion is most plausibly read as an unarticulated application of that doctrine. By focusing on the admittedly sympathetic facts of this particular marriage and this particular child, while simply sweeping away our established law and the history of dissolution and custody matters,

the concurring and dissenting opinion would transform the legislative concept of the child of the marriage into the judicial concept of the equitable parent. For the reasons articulated elsewhere in this opinion, we decline to follow that path.

## IV

Having concluded that the trial court had jurisdiction to adjudicate the custody of the child as between the defendant, as the child's father, and the plaintiff, as a third party asserting a claim to custody, giving due regard to the statutory presumption afforded by § 46b-56b, we turn to a discussion of the potential effect of that statutory presumption in this case, in order to give some guidance to the trial court on remand. Section 46b-56b provides: "In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody."

"This statute was enacted to counteract the holding of *McGaffin* v. *Roberts*, 193 Conn. 393, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985), which held that [General Statutes] § 45-43 (now § 45a-606)[52] did not create a presumption that a surviving parent is entitled to preference in a custody dispute." *Bristol* v. *Brundage*, 24 Conn. App. 402, 405, 589 A.2d 1 (1991); see also *Hao Thi Popp* v. *Lucas*, 182 Conn. 545, 551, 438 A.2d 755 (1980) (in custody contest between parent and third party, constitutional right to family integrity requires presumption in favor of parent).

---

[52] General Statutes § 45a-606 provides: "Father and mother joint guardians. The father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal. If either father or mother dies or is

"The presumption, which is one of public policy, places upon the nonparent the burden of proving sufficient facts to put the presumed fact [that it is in the best interest of the child to be in the custody of the parent] into issue." (Internal quotation marks omitted.) *Garrett's Appeal from Probate*, 44 Conn. Sup. 169, 183, 677 A.2d 1000 (1994), aff'd, 237 Conn. 233, 676 A.2d 394 (1996). "The presumption . . . does not shift the burden of proof in a custody dispute between a parent and a nonparent, but makes that burden easier [for the parent] to sustain because it gives the parent an initial advantage. [H. Clark, Law of Domestic Relations (1968) § 17.5, p. 591]." *Evans* v. *Santoro*, 6 Conn. App. 707, 711 n.3, 507 A.2d 1007 (1986). So long as due regard is given to the presumption, however, "[t]he best interests standard remains the ultimate basis of a court's custody decision." (Internal quotation marks omitted.) *Garrett's Appeal from Probate*, supra, 183; *Hao Thi Popp* v. *Lucas*, supra, 182 Conn. 551.

As these authorities make clear, the presumption does not mean that the nonparent must, in order to rebut it, prove that the parent is unfit. It means that the parent has an initial advantage, and that the nonparent must prove facts sufficient to put into issue the presumed fact that it is in the child's best interest to be in the parent's custody. Once those facts are established, however, the presumption disappears, and the sole touchstone of the child's best interests remains irrespective of the parental or third party status of the adults involved. In that instance, then, neither adult— the parent or the third party—enjoys any advantage or suffers any disadvantage as a result of his or her parental or third party status.

We next address, therefore, the effect of the presumption, if any, in this case. Ordinarily, that would be a

removed as guardian, the other parent of the minor child shall become the sole guardian of the person of the minor."

question that we would leave to the trial court for its factual determination in the first instance. Under the extraordinary circumstances of this case, however, we conclude, for two reasons, that it is appropriate to address the effect of the presumption in the course of this appeal.

First, it is clear to us that, based on the undisputed facts of this case, the presumption has been sufficiently rebutted. Put another way, were the trial court upon our remand to fail to determine that the presumption was sufficiently rebutted, the undisputed facts of this case would compel us to conclude that its determination would be clearly erroneous. Those facts are as follows. The defendant participated in the public ruse that the plaintiff was the child's birth mother. Furthermore, for the nearly first eight years of the child's life, before the initiation of this action, the plaintiff and the defendant together raised and nurtured the child. In addition, for the more than seven years while this case has been litigated, in the trial court and on appeal, the parties have, by virtue of a court-approved stipulation, shared joint custody of the child, with the principal residence of the child being with the plaintiff. Under these facts, the trial court would abuse its discretion if it were to determine that the statutory presumption were not rebutted, under the standards for that determination that our case law articulates. Thus, we conclude that, as a matter of law, the presumption has been rebutted in this case.

Second, as we have noted, this case is now more than seven years old. The question of the ultimate custody of the child has been left in limbo for an extraordinary length of time. Under these circumstances, it is incumbent on us to shorten, to the extent possible, the remaining time it will take to resolve that question. By addressing and disposing of the question of the remaining effect, if any, of the statutory presumption

in this case, we exercise our sound appellate discretion so as to eliminate at least one significant question for determination following our remand.

On remand, therefore, the trial court will be required to adjudicate the custody of the child, without regard to the statutory presumption in favor of the parent afforded by § 46b-56b, based on the ultimate factor of the child's best interest. There was ample evidence in this record that, if credited, would have been sufficient to justify an award of joint custody to both parties.[53]

## V

We next consider the claims of the defendant that the trial court improperly: (1) found that the parties contributed equally to the breakdown of the marriage; (2) awarded periodic alimony and certain related life insurance benefits to the plaintiff; and (3) required the defendant to pay the attorney's fees of the plaintiff and the minor child. With respect to the factual claim of the parties' contribution to the causes of the marital breakdown, it is not necessary to detail the evidence supporting the court's finding. Suffice it to say that we have examined the entire record with care, and are satisfied that the finding is supported by the evidence and must stand.

In light of our conclusion, however, that the court will be required to adjudicate the custody of the child on remand, we decline to consider the defendant's

---

[53] For example, there was testimony from the family relations officer that disturbing the court-approved joint custody stipulation under which the parties have been operating during the six years of litigation in this dissolution action would have a "traumatic effect" on the child. There was also evidence from a clinical psychologist who had evaluated the entire family and recommended joint custody. In addition, § 46b-57 provides that, in determining the child's best interest, the court may give "consideration to the wishes of the child if [s]he is of sufficient age and capable of forming an intelligent preference." There was evidence that the strong preference of the child, who is now nearly fifteen, was to maintain the joint custody status.

financial claims. The court's custody determination may also necessitate an award of child support, and in light of the fact that the court's financial awards ordinarily constitute a mosaic; *Sunbury* v. *Sunbury*, supra, 210 Conn. 175; the child support award may alter the other financial awards. Thus, it would serve no useful purpose to review those awards at this stage of the litigation.

The judgment of dissolution of the marriage is affirmed; the remainder of the judgment is reversed and the case is remanded for a prompt trial on the custody of the minor child and on the financial issues.

In this opinion CALLAHAN, C. J., and NORCOTT and PALMER, Js., concurred.

KATZ, J., with whom BERDON and PETERS, Js., join, concurring in part and dissenting in part. The primary issue in these appeals is whether the trial court, in an action for the dissolution of a marriage, has jurisdiction to award custody of a minor child to the plaintiff wife, when that child was born to a surrogate mother (surrogate) who, with the consent and cooperation of the plaintiff wife, had been artificially inseminated with the defendant husband's sperm. This is a case of first impression for this court, and it requires us to come to terms with changing family structures—an area that has become increasingly complex with each new scientific innovation in the field of human reproduction. The majority decides, and I concur, that the trial court had jurisdiction over the child, thereby enabling it to decide issues of custody and support. The majority, however, is content to treat the plaintiff as a third party for purposes of making that determination. It is that assessment that causes me to dissent.

In June, 1993, the plaintiff filed for the dissolution of her marriage to the defendant. In addition to her claims

for financial support, relying on General Statutes § 46b-56,[1] she requested sole or joint custody of a minor child who was ten years old at the time of the complaint. The plaintiff acknowledged in her amended complaint that she was not the child's biological mother and that she had not adopted the child, but asserted at trial that she should be considered a parent for the purposes of determining custody because she and the defendant, the child's biological father, had acted as the child's parents from the time of the child's birth.

[1] General Statutes § 46b-56 provides: "Superior Court orders re custody and care of minor children in actions for dissolution of marriage, legal separation and annulment. Access to records of minor children by noncustodial parent. Parenting education program. (a) In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may at any time make or modify any proper order regarding the education and support of the children and of care, custody and visitation if it has jurisdiction under the provisions of chapter 815o. Subject to the provisions of section 46b-56a, the court may assign the custody of any child to the parents jointly, to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. The court may also make any order granting the right of visitation of any child to a third party, including but not limited to, grandparents.

"(b) In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into consideration the causes for dissolution of the marriage or legal separation if such causes are relevant in a determination of the best interests of the child and (2) consider whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b.

"(c) In determining whether a child is in need of support and, if in need, the respective abilities of the parents to provide support, the court shall take into consideration all the factors enumerated in section 46b-84.

"(d) When the court is not sitting, any judge of the court may make any order in the cause which the court might make under subsection (a) of this section, including orders of injunction, prior to any action in the cause by the court.

"(e) A parent not granted custody of a minor child shall not be denied the right of access to the academic, medical, hospital or other health records of such minor child unless otherwise ordered by the court for good cause shown."

The defendant moved to dismiss the plaintiff's complaint, on the ground that because the minor child was not a child of the marriage, the trial court lacked jurisdiction. Thereafter, the plaintiff amended her complaint to add a second count invoking third party status under General Statutes §§ 46b-57[2] and 46b-59.[3]

After the close of evidence, but prior to judgment, the defendant moved to open the evidence and requested that the trial court take judicial notice of two Probate Court judgments, the first declaring the defendant's paternity of the child and the second terminating the parental rights of the surrogate and her husband. The trial court chose not to open the evidence

[2] General Statutes § 46b-57 provides: "Third party intervention re custody of minor children. Preference of child. In any controversy before the Superior Court as to the custody of minor children, and on any complaint under this chapter or section 46b-1 or 51-348a, if there is any minor child of either or both parties, the court if it has jurisdiction under the provisions of chapter 815o, may allow any interested third party or parties to intervene upon motion. The court may award full or partial custody, care, education and visitation rights of such child to any such third party upon such conditions and limitations as it deems equitable. Before allowing any intervention, the court may appoint counsel for the child or children pursuant to the provisions of section 46b-54. In making any order under this section the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference."

[3] General Statutes § 46b-59 provides: "Court may grant right of visitation to any person. The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted. The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the

and admit the Probate Court judgments, reasoning that it would not be a miscarriage of justice to reject the offer of evidence.

In a memorandum of decision dated November 15, 1995, the trial court concluded that because the minor child was not a child of the marriage, had not been adjudicated the natural child of the defendant, and had not been adopted by either party, the court had no jurisdiction to decide the custody issues.[4]

The trial court found the following facts, which are not disputed by the parties. The plaintiff and the defendant were married in 1983. They had known each other since 1967, and had begun their relationship in 1971. Both parties wanted to have children. The plaintiff had been married once before, and was the mother of three adult sons. Prior to this second marriage, the plaintiff had undergone tubal ligation and an attempt to reverse that procedure had been unsuccessful. The plaintiff also suffered from a partial disability as a result of an automobile accident in 1972, which prevented her from carrying a pregnancy to term. Prior to the parties' marriage, with the plaintiff's knowledge and consent, the defendant placed a newspaper advertisement seeking a woman willing to bear a child for the couple. The surrogate answered the advertisement and agreed to be impregnated with the defendant's sperm. The actual insemination, by syringe, took place at the surrogate's home with both the defendant and the plaintiff present.

adoption of such child and any such court may include in its decree an order terminating such visitation rights."

[4] As the basis for its decision, the trial court relied on the language of General Statutes § 46b-58, which extends the authority granted to the court by § 46b-56 to "children adopted by both parties and to any natural child of one of the parties who has been adopted by the other," and concluded that the parties did not meet this standard. The trial court made no reference to the plaintiff's invocation of the third party provisions of § 46b-57, except to note in a footnote in its memorandum of decision that the plaintiff could proceed as a third party through a petition for habeas corpus.

Although the surrogate testified that she had become pregnant after this procedure, the trial court declined to find that the defendant was the child's biological father because at the time of trial there had been no adjudication of paternity by the Probate Court.

Both the defendant and the plaintiff assumed the roles of parents from the very beginning of the surrogate's pregnancy. Throughout the prenatal period, the surrogate used the plaintiff's name, social security number and statistical information for all birth records and doctor's visits. At times, both the defendant and the plaintiff escorted the surrogate to the doctor's office. During the surrogate's pregnancy, the plaintiff went so far as to stuff pillows underneath her clothing in order to appear pregnant. At the time of delivery, the surrogate was admitted to the hospital under the plaintiff's name. A certified copy of the child's birth certificate bears the names of the plaintiff and the defendant as the child's mother and father. According to the birth certificate, the defendant supplied this information to the hospital authorities. Upon release from the hospital, the surrogate surrendered custody of the baby to the plaintiff and the defendant, who, together, proceeded to raise the child with no further participation by the surrogate. Neither the plaintiff nor the defendant formally adopted the child.

I

I agree with the majority that the trial court abused its discretion in refusing to admit the Probate Court judgments. " 'Whether or not a trial court will permit further evidence to be offered after the close of testimony in the case is a matter resting within its discretion. *State* v. *Levy*, 103 Conn. 138, 145, 130 Atl. 96 [1925]; *State* v. *Chapman*, 103 Conn. 453, 479, 130 Atl. 899 [1925]; *King* v. *Spencer*, 115 Conn. 201, 203, 161 Atl. 103 [1932]; *State* v. *Swift*, 125 Conn. 399, 405, 6 Atl.

(2d) 359 [1939].' *Hauser* v. *Fairfield,* 126 Conn. 240, 242, 10 A.2d 689 [1940]. In the ordinary situation where 'a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence upon a material issue in the case of such a nature that in its absence there is serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time before the case has been decided.' " *State* v. *Holmquist,* 173 Conn. 140, 152, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977).

In its memorandum of decision, relying on the presumption that a child born to a married woman is the child of her husband; *Schaffer* v. *Schaffer,* 187 Conn. 224, 226, 445 A.2d 589 (1982); the trial court assumed that the surrogate and her husband could claim parental rights. The trial court stated that no "clear, convincing and satisfactory proof" had been offered to prove that the minor child was not issue of the *surrogate's* marriage. The trial court, in essence, found that neither the plaintiff *nor* the defendant could claim parental status and, accordingly, concluded that the child could not be issue of the marriage between the plaintiff and the defendant. Therefore, the trial court concluded that it had no jurisdiction under § 46b-56 to determine the custody issues. The trial court so concluded even though it *had* been offered proof of the defendant's paternity in the defendant's motion to open the evidence.

The trial court further stated in its decision that neither party was prejudiced by the refusal to open the evidence, because "[a] dissolution action is not the only vehicle by which an individual may petition our courts for an order of custody based upon the best interests of the child." It went on to suggest that the appropriate means by which the parties might seek custody was a habeas petition pursuant to General Statutes § 46b-1

(8).[5] I disagree with the trial court's finding as to prejudice.

Had the trial court admitted the Probate Court judgments, the entire posture of the case would have changed and the trial court would have had jurisdiction. Neither the surrogate nor her husband would have had any standing to participate in the outcome of this case. The defendant would have been allowed to proceed under § 46b-56 as the natural father of the child, and the plaintiff, at the very least, would have been able to proceed as a third party under § 46b-57 as pleaded, without having to institute separate proceedings.

Of even greater significance is the fact that the trial court's ruling has left the minor child in judicial limbo.[6] The defendant *has* been adjudicated to be the child's

[5] General Statutes § 46b-1 provides in pertinent part: "Family relations matters defined. Matters within the jurisdiction of the Superior Court deemed to be family relations matters shall be matters affecting or involving . . . (8) habeas corpus and other proceedings to determine the custody and visitation of children . . . ."

The defendant, apparently misinterpreting the trial court's reference in its footnote, and relying heavily on *LaBella* v. *LaBella*, 134 Conn. 312, 57 A.2d 627 (1948), insists that the plaintiff has no choice but to proceed with an action for habeas corpus in *Probate* Court. We disagree with the defendant's assertion. If the plaintiff *were* to choose to proceed with a habeas action, it is clear that the Superior Court would have the authority, under § 46b-1 (8), to entertain that claim.

[6] Although this court has never held specifically that a minor child may be a party to a dissolution action, we have made clear that the child is more than a disinterested observer. This conclusion is shared by the legislature and reflected in General Statutes § 46b-54, which allows the court to appoint an attorney to represent a minor child during a dissolution proceeding and provides that counsel for the child shall have an opportunity to be heard as to matters pertaining to the interests of the child, including custody, care, support and visitation, if to do so would be in the best interests of the child. "The purpose of appointing counsel for a minor child in a dissolution action is to ensure independent representation of the child's interest and such representation must be entrusted to the professional judgment of appointed counsel within the usual constraints applicable to such representation." (Internal quotation marks omitted.) *Knock* v. *Knock*, 224 Conn. 776, 791, 621 A.2d 267 (1993).

father, any parental rights the surrogate may have had have been terminated, the plaintiff, the only "mother" the child has ever known has been adjudicated a stranger, and, although the parties currently share custody as part of a stipulated agreement, the child's living arrangements are perpetually in doubt. In light of the child's independent interest in continuity and stability in family life; *Cappetta* v. *Cappetta*, 196 Conn. 10, 16, 490 A.2d 996 (1985); the trial court had a heightened obligation to consider all pertinent information available to it.

Therefore, I agree with the majority that the trial court abused its discretion in failing to open the evidence in order to admit the two Probate Court judgments. The *defendant's* failure to act earlier should not be used to defeat the *plaintiff's* claim of jurisdiction, when to do so would greatly affect the lives and the rights of the other parties. Indeed, it is the threat of prejudice to the other parties that underlies the rule that a trial court may, in its discretion, refuse to open the evidence. *State* v. *Chapman*, supra, 103 Conn. 479 ("trial court may, in the exercise of its discretion . . . permit additional evidence to be introduced, so long as the rights of the parties are fairly protected"). I now turn to the merits of the case and my disagreement with the majority.

## II

After a careful review of the arguments and theories presented by the parties and the amici, as well as pertinent authority from other jurisdictions and from scholarly commentary, I agree with the majority that: (1) the trial court had jurisdiction to determine the custody of the minor child pursuant to § 46b-56; and (2) that in the marital dissolution context in general, and in § 46b-56 specifically, a "child" means a "child of the marriage." I believe, however, unlike the majority, that the

meaning of that concept is *not* limited to a child conceived by both parties, a biological child of one parent who has been adopted by the spouse, and a child conceived through artificial insemination as recognized under General Statutes §§ 45a-771 through 45a-779. Under the specific facts of this case, it is consistent with the historical underpinnings of the statutory requirement to conclude that the parties' minor child is a child of the marriage. I would conclude, therefore, that because the child is a child of the marriage and because the plaintiff is a party to that marriage, the plaintiff must be considered a "parent" for the purposes of determining the child's custodial arrangements under § 46b-56 without regard to the presumption regarding custody as set forth in General Statutes § 46b-56b.[7]

"The process of statutory interpretation involves a reasoned search for the intention of the legislature.

---

[7] I find curious the majority's elimination of the presumption of § 46b-56b. General Statutes § 46b-56b provides: "In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody."

Typically, the trial court, on remand, would be required to inquire into whether the defendant had waived his entitlement to the statutory presumption by his course of conduct in participating with the plaintiff in the prebirth ruse and in continuing to raise the child as if both he and the plaintiff were her parents. The majority, however, relies on much of the reasoning in this concurring and dissenting opinion to conclude that, while the plaintiff is not as a matter of law the child's mother, the trial court must treat her as the child's mother under § 46b-56 without regard to § 46b-56b. Throughout the proceedings, the defendant refused to call the plaintiff the child's mother and referred to her as "the custodian." Today, the majority, by stripping the plaintiff of the title of mother, allows that abuse to continue. What additional abuse the defendant will be free to wreak by virtue of the majority's determination of parenthood remains to be seen. Furthermore, the elimination of the statutory presumption of § 46b-56b will not help the plaintiff, if she is not awarded custody, to have access to the academic or health records of the child under General Statutes § 46b-56e. On the contrary, if she is not awarded custody, because she is not a parent, she does not fall under that statute's umbrella.

. . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 431–32, 692 A.2d 742 (1997).

At issue in this case is the concept that the minor child be the "child of the marriage." As the majority points out, the revisions of § 46b-56 and its predecessor statutes have been interpreted by this court to confine the jurisdiction of the Superior Court to determine the custody of children to only those children who fit the descriptor "child of the marriage." *Remkiewicz* v. *Remkiewicz*, 180 Conn. 114, 117, 429 A.2d 833 (1980); *Morrow* v. *Morrow*, 165 Conn. 665, 668–69, 345 A.2d 561 (1974); *LaBella* v. *LaBella*, 134 Conn. 312, 316, 57 A.2d 627 (1948). The plaintiff has claimed that, under the facts of this case, the child must be considered a child of her marriage to the defendant. The defendant contends, and the majority agrees, that the child is not a child of the marriage. I agree with the plaintiff and would conclude that because our past decisions were based on facts not analogous to those in the present case, and because those decisions fail to explain adequately the textual and historical significance of the phrase "child of the marriage," they provide little support for the defendant's argument and have little controlling effect on our decision in this case.

The descriptor "child of the marriage" typically has been used as a means by which to distinguish between

illegitimate and legitimate offspring. *Morrow* v. *Morrow*, supra, 165 Conn. 668. Children who otherwise might have been deemed illegitimate were presumed at common law to be "children of the marriage" if they were born to the wife during the course of the marriage or, if born prior to the marriage, they were adopted by the nonbiological parent. Id., 669. This presumption of legitimacy shifted the burden of persuasion to the proponent of illegitimacy; *Holland* v. *Holland*, 188 Conn. 354, 358, 449 A.2d 1010 (1982); who was required to present "clear, convincing and satisfactory proof" that the husband was not the father of the child. *Schaffer* v. *Schaffer*, supra, 187 Conn. 226. Absent such proof, a child born to the wife during the course of the marriage has been considered a child of the marriage, even though the marriage itself took place after the child was conceived. See annot., 84 A.L.R.4th 655, 679–84 (1991).

The traditional explanation for this rule has rested in the concepts of bastardy and inheritance. Note, "Presumption of Legitimacy of a Child Born in Wedlock," 33 Harv. L. Rev. 306 (1919–20) ("[t]his [is] in accord with the strict notions of the common [law], and [is] probably based upon regard for property rights, a bastard being incapable of inheriting or of having any heirs except those of his own body"); see J. Ayer, Jr., "Legitimacy and Marriage," 16 Harv. L. Rev. 22, 23 (1902–1903) ("since it is necessary that the heir should be one whose right could be ascertained . . . marriage, an act capable of proof, could be relied upon as determining the heir"). The common-law adoption of this presumption was thus an equitable response to a perceived legal deficiency.

Although most issues of inheritance and property have been obviated by statute; see, e.g., General Statutes § 45a-438 (b) ("for purposes of intestate succession, an individual is the child of his genetic parents, regardless of marital status of such parents"); courts continue to

rely on this presumption in certain instances. See, e.g., *Holland* v. *Holland*, supra, 188 Conn. 354; *Schaffer* v. *Schaffer*, supra, 187 Conn. 224. In those cases in which courts continue to employ the presumption, it is because those courts have found that the equities or underlying policy issues of the case demand it, and not simply as a procedural survival from an earlier time, lacking in all import and meaning. See, e.g., *Ex parte Presse*, 554 So. 2d 406, 412 (Ala. 1989) (public policy considerations causing husband of child's mother at time of child's birth to be presumed father weightier than considerations supporting claim of biological father who did not acknowledge paternity until years later). Furthermore, in those cases in which the custodial status of a child is in question, the existence of the marriage furnishes this court with a principled basis upon which to rest our oft expressed policy of supporting the integrity of the family unit and protecting the best interests of the child. See *Castagno* v. *Wholean*, 239 Conn. 336, 341–52, 684 A.2d 1181 (1996).

This interest in protecting a child's right to family identification and family integrity is paramount; *Moore* v. *East Cleveland*, 431 U.S. 494, 503, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977); and is reflected in the legislative debate over the familial status of a child conceived through artificial insemination. In 1975, the Connecticut General Assembly adopted legislation that declared that "[a]ny child or children born as a result of [artificial insemination with the semen of a donor] shall be deemed to acquire, in all respects, the status of a naturally conceived legitimate child of the husband and wife who consented to and requested the use of [artificial insemination with the semen of a donor]." Public Acts 1975, No. 75-233, § 5, now codified as General Statutes § 45a-774.[8] At the same time, the General Assembly

---

[8] In Connecticut, there are no equivalent provisions covering the use of a surrogate or donor eggs, nor does the legislative history of the artificial

adopted, as a statement of policy and purpose, legislation declaring that the public policy of Connecticut has been to adhere to the common-law rule that every child born of a married woman in the course of a marriage is a legitimate child of that marriage. Public Acts 1975, No. 75-233, § 1, now codified as General Statutes § 45a-771. A proponent of the legislation explained that its adoption was a matter of "good public policy," and that its purpose was to avoid the problems that had arisen in other jurisdictions where children born through artificial insemination had been deemed *not* to be issue of the marriage.[9] 18 H.R. Proc., Pt. 4, 1975 Sess., pp. 1836–37, remarks of Representative Richard D. Tulisano.

---

insemination statutes, §§ 45a-771 through 45a-779, appear to contemplate such occurrences. This is in contrast to other jurisdictions, which have in place legislation regarding the use of surrogate or gestational mothers. See, e.g., Ariz. Rev. Stat. Ann. § 25-218 (A) (West 1991 & Sup. 1996) (banning formation of surrogate parentage contracts; portion of statute regarding presumption of parentage declared unconstitutional in *Soos* v. *Superior Court in County of Maricopa*, 182 Ariz. 470, 474, 897 P.2d 1356 [1994]); Ark. Code Ann. § 9-10-201 (b) (1) (Michie 1993) (if biological father is married, child born of surrogate mother is child of biological father and woman intended to be mother); Fla. Stat. c. 742.15 (1997) (allowing binding and enforceable surrogacy contracts between commissioning couple and gestational surrogate; commissioning couple takes on all parental rights and responsibilities); Nev. Rev. Stat. § 126.045 (1997) (allowing for surrogacy contract; contract must specify, inter alia, intended parentage of child); N.Y. Dom. Rel. Law §§ 121 through 124 (McKinney Sup. 1997–98) (surrogate parenting contracts void as against public policy; birth mother retains parental rights).

[9] Representative Richard D. Tulisano spoke in favor of the legislation as follows: "Mr. Speaker, the Bill before us today is one of new legislation for Connecticut. Relatively few states, but there are some, do have legislation in this field. What it effectively does, is insure that children who are conceived and born as a result of artificial insemination are legitimatized. It also insures that they have rights of inheritance through their parents. That is, their natural mother and her consenting spouse. It insures that the donor involved in this medical technique has no interest or rights of inheritance from the child so conceived. It is an attempt, ladies and gentlemen of this House, to protect rights, to make sure that in this State nothing occurs similar to that which has happened in some Canadian jurisdictions and in one Illinois jurisdiction in which it was decided that the technique of artificial insemination was (1) assumed at one point to be adultery, and (2) a con-

The various revisions of § 46b-56 also reflect the legislature's intent that the concept that the minor child be a "child of the marriage" be given a broader reading than previously afforded by this court. This conclusion is supported by the legislative history, which reveals that the individual legislators were primarily concerned with the possibility that courts would not consider adopted children to be issue of the marriage. See 10 S. Proc., Pt. 6, 1963 Sess., p. 2101, remarks of Senator Paul J. Falsey ("[T]he [statutes] dealing with divorce and the orders that the court may enter . . . regarding support and custody of children [make] references in some instances to children of the marriage, which would seem to eliminate adopted children. This bill would make it clear that the court could make such orders to adopted children as well.").

I agree with the majority that although the statute as revised allows persons other than the parents to contest custody, the fact that such a contest may take place only within the context of an action for an annulment, a dissolution of marriage or a legal separation; General Statutes § 46b-56 (a), incorporating by reference General Statutes § 46b-45; militates against a reading that would totally eliminate the concept of "child of the marriage." Contrary to the majority, however, I am persuaded from the legislative history of the statutes governing custody and related issues that a "child of the marriage" is not always necessarily the biological or adopted offspring of both parents. I read this history as a recognition by the legislature that there are certain factual circumstances under which a child who is the biological or adopted child of only one of the parties

senting spouse in an Illinois jurisdiction, ladies and gentlemen, was declared not to have the duties of support. So it seems to me, this is good public policy. It is the kind of thing that will put Connecticut in advance of the other states of this nation. . . . We are anticipating a problem before it occurs." 18 H.R. Proc., Pt. 4, 1975 Sess., pp. 1836–37.

to the marriage is nonetheless considered a "child of the marriage" for the purposes of determining inheritance, support or custody. This concept was created originally as an equitable response to perceived legal deficiencies, and its historical significance obliges the court to expand the term "child of the marriage" beyond the gatekeeping function assigned to it by the majority. Accordingly, I would conclude that § 46b-56 continues to incorporate the concept that the child whose custody is at issue be .a child of the marriage that is being dissolved, but that it no longer requires that in every case the child be the biological or the adopted child of both parties to the marriage.

This court previously has considered similar issues and has concluded that the Superior Court lacked jurisdiction to determine the custody of children because they were deemed not to be children of the marriage. See, e.g., *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 117 (stepfather who did not adopt child born four years prior to marriage could not be required to pay support for child after marriage had ended); *Morrow* v. *Morrow*, supra, 165 Conn. 668-69 (court lacked jurisdiction to award custody because child was conceived *and* born before marriage and, therefore, was not child of marriage); *LaBella* v. *LaBella*, supra, 134 Conn. 316 (court lacked jurisdiction to award custody of minor child to wife because child was offspring of husband's adultery and not child of marriage). In all of those cases, however, the birth of the child had no relationship to the act of marriage—in *LaBella* the child was the product of an extramarital affair, in *Morrow* and in *Remkiewicz* the child was born well before the parties were married—and, therefore, the holdings are inapposite to the facts of this case, in which the parties were married to raise this child and both parties acquiesced and participated in planning her conception and birth. Furthermore, these are cases involving limitations on

jurisdiction, which the majority recognizes "have been overtaken by subsequent statutory changes." *Remkiewicz* v. *Remkiewicz*, supra, 116;[10] *Morrow* v. *Morrow*, supra, 670; *LaBella* v. *LaBella*, supra, 316–17. Consequently, because these cases focused on jurisdictional limitations, they are of limited value in defining who is a parent under § 46b-56.

The majority maintains that the statutes governing dissolution control the playing field and relies on our cases to define the contours of the concept of a "child of the marriage." At first glance the analysis appears to apply traditional rules of statutory interpretation. As I have previously noted, the cases upon which the majority relies were decided in the context of jurisdictional limitations that have been overtaken by statutory amendments. Therefore, I suggest that reliance on these cases to interpret the statute in its present form more

---

[10] In his amicus brief, the attorney general suggests that in light of the 1973 statutory revision, we should reconsider our reliance on this jurisdictional requirement in *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 114. In that case, a child was born to the plaintiff wife in 1967, while she had been married to a man other than the defendant. Thereafter, in 1971, the plaintiff married the defendant, who treated the child as his own. When the plaintiff brought an action for dissolution, she had been receiving state support. Consequently, the attorney general was made a party to the action and moved for an order of child support. This court held that the trial court had no jurisdiction to enter an order of support against the defendant. "The word 'children' in [§ 46b-56] means legitimate children." Id., 117, citing *State* v. *Wolfe*, 156 Conn. 199, 203, 239 A.2d 509 (1968). The court, however, failed to consider the 1973 and 1974 amendments and the legislature's intent to broaden the court's jurisdiction to reach disputes concerning children not traditionally considered "legitimate." Consequently, I find that case to be of limited value in deciding the issues presently before the court.

Although the majority holds that the term "child of the marriage" is not a jurisdictional limitation, it relies on the concept to reject the plaintiff's claim that she is the mother of the child and to reject the attorney general's invitation to provide a more expansive view of parentage. Because the plaintiff in *Remkiewicz* married the defendant only after the child was already four years old, facts clearly distinguishable from those in the present case, I am not compelled to overrule that case in order to respect the legislature's intent.

accurately reflects the application of the common-law principles embodied in those cases, thereby raising the specter that this case is no longer simply a matter of statutory construction. To the extent that the majority implicitly acknowledges the importance of common-law equitable considerations in deciding who is a parent, I agree that we should not disavow equitable considerations.

Although the method the parties in the present case chose to bring a child into being was unorthodox, the marriage itself and the child's place in that marriage were the very essence of a traditional marriage and family. The child in this case has more in common with a child who is the product of artificial insemination than with the children at issue in *LaBella, Morrow* or *Remkiewicz*. See footnote 9 of this opinion and the accompanying text. In the present case, the plaintiff and defendant were married to raise this child. Because the plaintiff was unable to conceive or bear a child herself, she and the defendant participated in a procedure by which a surrogate was inseminated with the defendant's sperm. The plaintiff assisted in the actual insemination of the surrogate, and was present at the conception. Both the plaintiff and the defendant intended from the time the child was conceived that they should be the only mother and father the child ever knew. Although the parties failed to finalize their relationship with the child through the proper probate procedures, it is clear from their actions, including the listing of the plaintiff as the child's mother on the original birth certificate, that they intended that the plaintiff should have all the rights and concomitant responsibilities of a biological *and* psychological mother. For ten years the plaintiff cared for the child, fulfilling the child's physical, emotional and psychological needs. In light of these facts, and with a renewed understanding of the historical and social underpinnings of the concept

that the child at issue be a "child of the marriage," I would conclude that the child here is a child of the marriage between the plaintiff and the defendant.[11]

## III

Having concluded that the child was a child of the marriage, I next address the issue of the plaintiff's status in the custody determination. Although it is clear, as the majority holds, that, had the trial court acknowledged the Probate Court judgments, it could have decided the plaintiff's claims regarding child custody, treating the defendant as the child's parent and the plaintiff as a third party nonparent, the plaintiff nevertheless has asked this court to find that the trial court had authority under § 46b-56 to determine the child's best interests as between two parents seeking custody. Allowing the plaintiff to proceed as a parent under § 46b-56, rather than as a nonparent who must overcome the presumption of § 46b-56b,[12] is a crucial distinction because § 46b-56b places a far heavier burden on a nonparent than on a parent. As a *parent*, the plaintiff would be entitled to have her custody claim given the same level of consideration as the defendant's claim, whereas if she were to proceed as a nonparent there

[11] Although at one time there may have been concern regarding the surrogate's interest in the child, the trial court found that upon discharge from the hospital, the surrogate turned the child over to the plaintiff and the defendant, "who nurtured and raised the child with no further participation by the surrogate mother." Moreover, the surrogate relinquished any rights she may have had, and once her parental rights were terminated, the record of any evidence of her purported interest became irrelevant.

[12] See footnote 7 of this opinion for the text of § 46b-56b. The provision allowing for rebuttal of the presumption has been interpreted to mean that in order for the nonparent third party to acquire custody, he or she would first have to prove that the parent was not a suitable custodian or that to give custody to the parent may harm the child. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1986 Sess., p. 481, remarks of Hon. Glenn Knierim, Probate Court administrator; id., p. 549, remarks of Raphie Podolsky, Center for Advocacy and Research; id., p. 573, letter of Cynthia McKenna, children and the courts committee.

would be a presumption in favor of the defendant, whose parental status previously has been adjudicated by the Probate Court. "The significance of parental status in custody . . . proceedings is profound. In a custody dispute, parents stand on equal footing with respect to one another, and the court determines custody under a best interests of the child standard. When the dispute is between a parent and a nonparent, not only is the parent usually considered the preferred custodian, but the nonparent may even be found without standing to challenge parental custody."[13] N. Polikoff, "This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families," 78 Geo. L.J. 459, 471–72 (1990); see *Garrett's Appeal from Probate*, 237 Conn. 233, 236, 676 A.2d 394 (1996); *Perez* v. *Perez*, 212 Conn. 63, 77–80, 561 A.2d 907 (1989).

The defendant argues in response that, because the plaintiff has no biological ties to the child and did not adopt her, she would be able to proceed only as a third party. The majority agrees with the defendant that the plaintiff is not his equal. If the plaintiff were not able to prove the facts alleged in her complaint supporting her theory of estoppel, the trial court would typically be bound by the presumption of § 46b-56b. See footnote 7 of this opinion. I disagree with the majority and would conclude that, under the specific factual circumstances of this case, it is appropriate to treat the plaintiff as the child's parent, and not as a third party. See *In re Marriage of Allen*, 28 Wash. App. 637, 639, 626 P.2d

---

[13] "The concept of standing, as it relates to custody actions, is not identical to the standing requirements for challenging an administrative agency ruling. . . . Standing in custody cases has generally referred to whether an individual has status to bring an action for custody under the applicable statute." (Citations omitted.) *In re Interest of Z.J.H.*, 162 Wis. 2d 1002, 1008 n.3, 471 N.W.2d 202 (1991); see *Weidenbacher* v. *Duclos*, 234 Conn. 51, 64, 661 A.2d 988 (1995) and cases cited therein.

16 (1981) ("unique circumstances may warrant unique custody decrees").

Not surprisingly, very few courts have been faced with the question before the court in the present case. The issues of parentage and custody usually arise in those dissolution actions in which the mother or putative father of a child avers that the putative father is not the child's biological father; see, e.g., *Atkinson* v. *Atkinson*, 160 Mich. App. 601, 606, 408 N.W.2d 516 (1987); or in the aftermath of the dissolution of a nontraditional relationship in which only one party has a biological tie to the child. See, e.g., *Alison D.* v. *Virginia M.*, 155 App. Div. 2d 11, 552 N.Y.S.2d 321 (1990); see also annot., 84 A.L.R.4th 655 (1991). In the future, however, as the concept of family becomes more fluid and as science continues to expand the frontiers of human reproduction, I am certain that more courts will be faced with fact patterns much like the one we address today. *Michaud* v. *Wawruck*, 209 Conn. 407, 415, 551 A.2d 738 (1988). Indeed, as the science of blood and deoxyribonucleic acid (DNA) testing becomes more exact, questions of biological parentage may quickly be answered; see *Weidenbacher* v. *Duclos*, 234 Conn. 51, 71, 661 A.2d 988 (1995); *Palomba* v. *Gray*, 208 Conn. 21, 36–37, 543 A.2d 1331 (1988) (*Shea, J.,* concurring); leaving only the increasingly difficult questions rooted in social ideals and mores.

Although, traditionally, family law to a great degree has been a creature of statute, family law has also been the responsibility of state courts reacting to fundamental changes in the way that the family has evolved. The traditional American nuclear family of a married couple and their own children has been subsumed by a range of alternatives.[14] See *Michaud* v. *Wawruck*, supra, 209

[14] "See generally Martha Minow, 'The Free Exercise of Families,' 1991 U. Ill. L. Rev. 925, 930–32 (noting that traditional American nuclear family has been subsumed by range of alternatives, including single-parent families

Conn. 415. As expected, some courts are more amenable to the changes in the definition of family than others.[15] "Across the nation, state courts are reexamining the roles of biological ties and other relationships in the family. Courts consider those relationships against a background of new techniques, medical advances, and evolving life styles." S. Pollack, "The Art of Judging," 71 N.Y.U. L. Rev. 591, 609 (1996); see, e.g., *Baehr* v. *Lewin*, 74 Haw. 530, 580, 852 P.2d 44 (1993) (because denial of marriage license to homosexual couple could constitute sex-based discrimination it must be reviewed subject to strict scrutiny under state equal protection clause); *Bezio* v. *Patenaude*, 381 Mass. 563, 578, 410 N.E.2d 1207 (1980) (homosexuality does not render mother unfit custodian); *In re Baby M.*, 109 N.J. 396, 429–44, 537 A.2d 1227 (1988) (surrogacy contract rejected as conflicting with existing statutes and public policy of state); *In the Matter of Jacob*, 86 N.Y.2d 651, 656, 660 N.E.2d 397, 636 N.Y.S.2d 716 (1995) (unmarried companion, whether male or female, of child's biological mother can adopt mother's child). "Brush stroke by brush stroke, state courts are painting a new portrait of the American family." S. Pollack, supra, 613.

In recognition of the new portrait of the American family, the plaintiff and the Connecticut Chapter of the American Academy of Matrimonial Lawyers, in its amicus brief, urge this court to adopt the doctrine of the

and cohabiting unmarried adults); Libby Post, 'The Question of Family: Lesbians and Gay Men Reflecting a Redefined Society,' 19 Fordham Urb. L.J. 747, 748 (1992) (stating that 'the heterosexual two-parent, bread-winner father and homemaker-mother family is now the exception to the rule')." S. Pollack, "The Art of Judging," 71 N.Y.U. L. Rev. 591, 608 n.96 (1996).

[15] Cases in which courts have had to grapple with the changes in family structure have arisen in a variety of areas. See, e.g., *Braschi* v. *Stahl Associates Co.*, 74 N.Y.2d 201, 543 N.E.2d 49, 544 N.Y.S.2d (1989) (landlord tenant dispute); *Glassboro* v. *Vallorosi*, 117 N.J. 421, 568 A.2d 888 (1990) (zoning). The disparate results across the country reflect the tension in society between the desire to preserve tradition and the need to recognize changing lifestyles.

"equitable parent," as set forth in *Atkinson* v. *Atkinson*, supra, 160 Mich. App. 601.[16] The court in *Atkinson* developed a three part test to determine whether a nonbiological parent should be granted parental status in a custody dispute. Under that test, a nonbiological parent may be on equal footing with a biological parent if "(1) the [person] and the child mutually acknowledge a relationship as [parent] and child, or the [biological parent] of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the [person] desires to have the rights afforded a parent, and (3) the [person] is willing to take on the responsibility of [raising the child]." Id., 608–609. Since the *Atkinson* decision, other jurisdictions have relied on the doctrine of the equitable parent, or on similar theories, to allow a nonparent to seek custody under the same criteria as would be applied to a biological or adoptive parent. See, e.g., *Carter* v. *Brodrick*, 644 P.2d 850, 855 (Alaska 1982) ("those relationships that affect the child which are based upon psychological rather than biological parentage may be important enough to protect through custody"); *In re Marriage of Gallagher*, 539 N.W.2d 479, 481–82 (Iowa 1995) (adopting modified *Atkinson* test); *State in Interest of J.W.F.*, 799 P.2d 710, 715 (Utah 1990) (stepfather has standing to seek custody under best interests standard); *In re Marriage of D.L.J. & R.R.J.*, 161 Wis. 2d 420, 426–29, 469 N.W.2d 877 (App. 1991) (applying *Atkinson* factors, nonbiological father who fulfilled numerous parental duties granted equitable parent status).

Although the equitable parent doctrine has some intrinsic appeal, I am reluctant to adopt such new law

---

[16] I disagree with the defendant's argument that the doctrines of equitable estoppel and equitable parentage are essentially the same. Although both address the issues of representation and reliance, equitable parentage focuses primarily upon the relationship between the nonbiological parent

at this time and under these circumstances, particularly when the plaintiff's unusual predicament has been brought about, in part, by the parties' deceptive conduct.[17] My disapproval of their deceptive actions, however, cannot color my interpretation of the law. Rather, it has been my goal to resolve this case in a way that is in keeping with the law, while at the same time recognizing the highly unusual facts of this case. As the amicus Connecticut Chapter of the American Academy of Matrimonial Lawyers concedes, the plaintiff cannot be both a parent and a third party. I would resolve this issue by resort to common sense.

"Common sense . . . is a highly significant guide to statutory interpretation." *Trumbull* v. *State*, 206 Conn. 65, 80, 537 A.2d 431 (1988); see *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 741, 687 A.2d 506 (1997) (" '[i]n the interpretation of statutory provisions, the application of common sense to the language is not to be excluded' "). Section 46b-56 provides that, subject to the provisions of General Statutes § 46b-56a,[18] the Superior Court may assign the

and the child whose custody is at issue, while equitable estoppel focuses exclusively on the nonparent's reliance on the representations of the parent.

[17] This court has used statutes as a source of policy for common-law adjudication, particularly where there has been a close relationship between the statutory and common-law subject matters. See *Fahy* v. *Fahy*, 227 Conn. 505, 514–15, 630 A.2d 1328 (1993). A statute is itself a source of policy for consistent common-law development. E. Peters, "Common Law Judging in a Statutory World: An Address," 43 U. Pitt. L. Rev. 995, 998 (1982). Therefore, in order to permit greater latitude in custody determinations, in accordance with the policy expressed in the legislative amendments, this court could, if it so desired, use this adjudicative technique and entertain the doctrine of equitable parent as a matter of common-law adjudication.

[18] General Statutes § 46b-56a provides: "Joint custody. Definition. Presumption. Conciliation. (a) For the purposes of this section, 'joint custody' means an order awarding legal custody of the minor child to both parents, providing for joint decision-making by the parents and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents. The court may award joint legal custody without awarding joint physical custody where the parents have agreed to merely joint legal custody.

custody of a child to both parents jointly, to either parent or to a third party. Section 46b-56 also incorporates, by reference, General Statutes § 46b-45, which deals with annulment, dissolution of marriage and legal separation. A common sense reading of these statutes in their totality leads me to conclude that, for the purposes of § 46b-56, "third party" must be defined as a third party to the marriage that is at issue in the controversy before the court. Accordingly, if a person is a party to the marriage being dissolved, and the child whose custody is at issue is determined to be a child of that marriage, that person is not a third party and should be treated as a "parent."

If, as I have concluded, the child in the present case is the child of the plaintiff's marriage to the defendant, it follows that the plaintiff must be given parental status for the purpose of determining custody. As the attorney general points out in his amicus brief, "[i]t is logical to assume that it is generally in the child's best interest to have more than one parent . . . [and] it is reasonable in the context of this dissolution to construe the term 'parent' in . . . § 46b-56 to include the plaintiff . . . ."[19] The issue of parental identity is far more than a mere formality to the child who has her own independent interests in the integrity of the family unit. *Weidenbacher* v. *Duclos*, supra, 234 Conn. 74. We presume that

"(b) There shall be a presumption, affecting the burden of proof, that joint custody is in the best interests of a minor child where the parents have agreed to an award of joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child or children of the marriage. If the court declines to enter an order awarding joint custody pursuant to this subsection, the court shall state in its decision the reasons for denial of an award of joint custody.

"(c) If only one parent seeks an order of joint custody upon a motion duly made, the court may order both parties to submit to conciliation at their own expense with the costs of such conciliation to be borne by the parties as the court directs according to each party's ability to pay."

[19] I note that "parent" for purposes of § 46b-56 does not have a statutory definition. Contrast General Statutes §§ 17a-93 (b) and 45a-604 (3). There-

in defining the contours of parentage, the legislature acted in accordance with the underlying purpose of chapter 815j of the General Statutes, which is to protect the best interests of the child. Interpreting § 46b-56 to accommodate the child's definition of what is a parent, and thereby acknowledge the plaintiff as her mother, serves to maintain the continuity and stability of the child's environment consistent with that legislative purpose.

The California Court of Appeal, recognizing the traditional role of the common law in applying old legal principles to new technology, applied many of the same considerations in deciding a recent case involving Luanne and John Buzzanca, who had agreed to have an embryo genetically unrelated to either of them implanted in a woman, a surrogate, who would carry and give birth to the child for them. *Buzzanca* v. *Buzzanca*, California Court of Appeal, Docket No. GO22147 (4th D. March 10, 1998). After fertilization, implantation and pregnancy, the Buzzancas separated, and the question of who the child's lawful parents were came before the trial court as part of the dissolution action. Luanne claimed that she and John were the child's lawful parents, John disclaimed any responsibility, and the surrogate stated that she made no claim to the child. The trial court concluded that the child had no lawful parents. Id., 2. First, the trial court accepted a stipulation that the surrogate and her husband were not the "biological" parents. The trial court then concluded that Luanne was not the mother because she had neither contributed the egg nor given birth, and that John was not the father because he had not contributed the sperm and therefore had no biological relationship with the child.[20] Id.

---

fore, there is no legislation directly prohibiting a determination by this court that the plaintiff in the present case is the child's parent.

[20] Neither of the Buzzancas had formally adopted the child.

On appeal, John Buzzanaca argued that because under California's Uniform Parentage Act; Cal. Fam. Code § 7600 et seq. (Deering 1996); and particularly as set forth in § 7610 of California's Family Code, there are only two ways a woman can establish motherhood, i.e., by giving birth or by contributing genetically, Luanne Buzzanca could not be the child's mother.[21] He further argued that, because the identities of the genetic contributors were not known to the court, the surrogate and her husband had to be the legal parents. *Buzzanca v. Buzzanca*, supra, California Court of Appeal, Docket No. GO22147, 6–7. Conversely, Luanne continued to argue that she and John were the legal parents. The Court of Appeal held that both Luanne and John were the parents, concluding that "[j]ust as a husband is deemed to be the lawful father of a child unrelated to him when his wife gives birth after artificial insemination, so should a husband and wife be deemed the lawful parents of a child after a surrogate bears a biologically unrelated child on their behalf. In each instance, a child is procreated because a medical procedure was initiated and consented to by intended parents." Id., 3.

First, the court cited at length to an earlier case involving surrogacy in which it had held that although § 7610 contains no direct reference to genetics, genetics is subsumed in the words under this part, and "that genetic consanguinity was equally 'acceptable' as 'proof of maternity' as evidence of giving birth." Id., 8; see *Johnson* v. *Calvert*, 5 Cal. 4th 84, 93, 851 P.2d 776, 19 Cal. Reptr. 2d 494 (1993). In reaching that decision by

---

[21] California Family Code § 7610 (Deering 1996) provides: "The parent and child relationship may be established as follows:

"(a) Between a child and the natural mother, it may be established by proof of her having given birth to the child, or under this part.

"(b) Between a child and the natural father, it may be established under this part.

"(c) Between a child and an adoptive parent, it may be established by proof of adoption."

a "parity of reasoning"; *Johnson* v. *Calvert*, supra, 92; the court in *Johnson* had looked to a variety of statutes, all of which by their terms applied only to paternity. Id., 90–92. Indeed, in *Buzzanca*, the court stated that "[i]t was only by a parity of reasoning from statutes which, on their face, referred only to *paternity* that the court in [*Johnson*] reached the result it did on the question of *maternity*." (Emphasis in original.) *Buzzanca* v. *Buzzanca*, supra, California Court of Appeal, Docket No. GO22147, 8. In the same vein, recognizing that the legislature may not have contemplated the application of the artificial insemination statute to a gestational surrogacy case in which the genetic donors are unknown to the court, the *Buzzanca* court then turned to California's artificial insemination statute; Cal. Fam. Code § 7613 (Deering 1996); as "the clearest expression of past legislative intent when the legislature did contemplate a situation where a person who caused a child to come into being had no biological relationship to the child." *Buzzanca* v. *Buzzanca*, supra, 10. The court concluded that there was no reason to distinguish between husbands and wives because they are equally situated from the point of view of consenting to an act that brought the child into being. Id., 20–21.

Given their roles as the intended parents in the conception and birth of the child, and recognizing further that public policy favors, whenever possible, the establishment of legal parenthood with the concomitant responsibility, the court concluded that Luanne and John Buzzanca were the legal parents of the child. Id., 24. Although the court called upon the legislature to sort out parental rights and responsibilities of those involved in artificial reproduction, and indeed, appreciating that the legislature is the preferred forum for lawmaking, the court recognized its ability to make decisions on an ad hoc basis without necessarily imposing some grand scheme, looking to the imperfectly

designed body of statutes and a growing body of case law for guidance in light of the applicable family law principles. Id., 24–25.

In the present case, the facts are more compelling because they go well beyond an agreement that set in motion a medical procedure that resulted in the birth of a child. The parties in this case performed as parents pursuant to that agreement for more than ten years. If intent of the parties were the ultimate basis of a decision of lawful parentage, this case presents the best example of the need of the court to be able to establish motherhood by conduct apart from giving birth or being genetically related to a child.

I acknowledge that to extend parental rights to an adult who has no biological ties to a child could be seen as opening the door to an onslaught of litigants seeking to have a variety of family relationships validated for the purpose of determining custody. I also acknowledge the possibility that certain unscrupulous parties could use such a decision as a new tool for leverage in an inimical divorce action. It is not my intent to open the door to all unrelated third parties who happen to feel a bond of affection with a child. Indeed, the factual context of this case, limited as it is to dissolution, separation and annulment proceedings pursuant to § 46b-56, substantially lessens this risk. Nor do I intend to invade or diminish the rights of the biological parent. Biology, however, is not always dispositive when we are making decisions regarding the care and welfare of children. See *Weidenbacher* v. *Duclos*, supra, 234 Conn. 76. My decision is limited to this extreme case, in which the marriage was entered into to raise this child and the plaintiff, who seeks custody, has acted as the child's parent from birth and no other party has acted in the same parental role, such that to deprive

the child of the care and affection of the plaintiff would be to deprive that child of a parent.[22]

In addition, I note that by deeming the minor child a "child of the marriage" and by concluding that, as a party to that marriage, the plaintiff, as a nonbiological parent, must have equal footing with the defendant in the custody determination, I recognize not only the plaintiff's right to seek custody, but also her ongoing responsibility to provide care and support for the child, apart from any custody determination. She may not assume or shed her parental role at will. Finally, I caution that my conclusion would not automatically entitle a nonbiological parent to custody. The determination of custody should focus less on the legal relationship between the parties than on the best interests of the child.

I would reverse the judgment of the trial court regarding its lack of jurisdiction to determine custody of the minor child and remand the case to that court for determination of custody and support pursuant to § 46b-56, treating both the defendant and the plaintiff as *parents*, and applying the ultimate standard—the best interests of the child.

Accordingly, I respectfully dissent from part III of the majority opinion.

---

[22] As the attorney general suggests in his amicus brief, we must construe the custody statutes in a manner consistent with their overarching purpose, which is to protect the child's interests in establishing and maintaining a parent-child relationship.